SEETRANSPORT WIKING TRADER SCHIFFARHTSGESELLSCHAFT MBH & CO. KOMMANDITGE-SELLSCHAFT, Plaintiff,

v.

The REPUBLIC OF ROMANIA, Defendant.

No. 96 CIV. 314 JES.

United States District Court, S.D. New York.

Dec. 1, 2000.

---

Kelley Drye & Warren, New York, NY, Bud G. Holman, Paul F. Doyle, Of Counsel, for Plaintiff.

Herzfeld & Rubin, P.C., New York, NY, Cary Stewart Sklaren, Maureen Doerner Fogel, Of Counsel, for Defendant.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft ("Seetransport" or "plaintiff"), a German shipping company, brings the above-captioned action against The Republic of Romania ("Romania" or "defendant"), for sums owed to it by enterprises allegedly owned by the Romanian State. Following extensive proceedings and motion practice before this Court, plaintiff and defendant engaged in lengthy settlement discussions and afterward concluded a written "Amicable Agreement" ("the Amicable Agreement" or "Agreement") which purported to settle all of plaintiff's claims. Plaintiff now contends that defendant has failed to fulfill its obligations under the Agreement and the amendments thereto and brings the instant motion for its enforcement.

Following briefing on the motion by both parties, this Court held a hearing on July 27 and 28, 1999, in which it heard testimony from participants in the settlement discussions and experts in Romanian law. Upon hearing extensive testimony, and considering all evidence and arguments raised by both parties during the hearing and in post-hearing submissions and argument, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. In sum, this Court finds that the Amicable Agreement and the amendments thereto are enforceable against defendant under applicable law and judgment shall be entered accordingly.

## FINDINGS OF FACT

This litigation represents a long and arduous path undertaken by plaintiff Seetransport to recover sums paid to Navimpex Centrala Navala ("Navimpex"), a now-defunct Romanian State-owned company, for the construction and delivery of four bulk carriers pursuant to a Contract for Sale entered into on or about January 26, 1980 ("the Vessel Contract"). *See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 574 (2d Cir.1993). After the Vessel Contract was consummated and plaintiff had paid money pursuant to such contract, several disputes between the parties arose, and the Vessel Contract was never performed. *See id.* The parties submitted their disputes to the Court of Arbitration of the International Chamber of Commerce in Paris, which held hearings and ultimately on March 26, 1984 issued an award in plaintiff's favor for 6,000,000 Deutsche Marks (DM), plus $72,000 in ar-

bitration fees and interest at a rate of eight percent per year starting from January 1, 1981 ("the Arbitration Award"). *See* Complaint dated January 17, 1996 ("Complaint") at ¶¶ 17–18. Upon appeal by Navimpex for annulment, the Court of Appeals of Paris ("the French Court") affirmed the arbitration award and dismissed Navimpex's appeal on March 4, 1986 ("the French Court Award"). *See id.* at ¶ 19.

Despite the order of the French Court, Navimpex failed to make any payments to Seetransport, and, in June 1987, the Romanian Council of State dissolved Navimpex and established another company, Uzinimportexport ("Uz"), which assumed Navimpex's assets and liabilities. *See* Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment dated March 4, 1996 ("Pl. S.J.Mem.") at 3. In order to enforce the Arbitration Award, Seetransport filed an action against Navimpex and Uz before Judge Vincent L. Broderick of this Court on March 28, 1998 pursuant to the Convention on the Recognition and Enforcement of Arbitral Awards, 9 U.S.C. § 201–208 (2000).[1] *See id.* Judge Broderick, in ruling on the parties' cross-motions for summary judgment, found for plaintiff, holding that Navimpex was an "agency or instrumentality" of the State of Romania, that it lacked sovereign immunity under 28 U.S.C. § 1605(a)(6) (2000) of the Foreign Sovereign Immunities Act ("FSIA"), and that Uz as successor to Navimpex should be joined and concomitantly would be "bound by the acts of [Navimpex], which cannot avoid its obligations by changing its name." Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 793 F.Supp. 444, 448 (S.D.N.Y.1992). The Court accordingly

entered judgment for plaintiff enforcing the arbitration award. *See id.*

On appeal by Navimpex, the Second Circuit agreed in large part with Judge Broderick but vacated the Court's finding on the grounds that the action for the confirmation of arbitration was not timely filed. *See Seetransport,* 989 F.2d at 580–81. It remanded, however, for a determination of *exequatur,* or a finding as to whether the French Court's Award rejecting Navimpex's appeal arose to the status of a judgment under French law.[2] *See id.* at 583. Upon remand, Judge Charles L. Brieant of this Court found that the doctrine of *exequatur* required that the French Court Award be treated as a French judgment enforceable in the United States, and that judgment against Uz was still warranted. *See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala,* 837 F.Supp. 79, 80 (S.D.N.Y.1993). This ruling was thereafter affirmed by the Second Circuit. *See Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co. Kommanditgesellschaft v. Navimpex Centrala Navala,* 29 F.3d 79, 83 (2d Cir.1994).

Nevertheless, Uz's General Manager personally declared that Uz would not honor the judgment, as he believed it was properly against Navimpex alone and that this Court's joinder of Uz was improper. *See* Pl. S.J. Mem. at 8. Accordingly, to secure payment of the judgment, Seetransport served subpoenas on a number of financial institutions with possible associations with Uz. *See id.* However, without Uz's cooperation, Seetransport was unsuccessful in locating sufficient assets owned by Uz in the United States to satisfy the judgment, and thus again requested this Court's assistance. *See id.* Accordingly, on December 29, 1995, upon determining pursuant to 28 U.S.C. § 1610(c) of the

---

1. Romania, France and the United States are signatories to the Convention. *See Seetransport,* 989 F.2d at 575.

2. Under French law, a French court can give an arbitration award the status of a judgment

through its rejection of the appeal of such award. *See Seetransport,* 989 F.2d at 582. This order of *"exequatur,"* or enforceability, is a French court's official recognition of the arbitration award as a judgment. *See id.*

FSIA that a "reasonable period of time had elapsed following entry of judgment" and that defendants had no meritorious defense, this Court ordered that plaintiff could enforce its judgment against defendant's property and assets. *See* Order dated December 29, 1995.

*The Instant Action*

Still unable to secure its judgment against Uz, Seetransport filed the instant action against the Republic of Romania on January 17, 1996, alleging under a theory of piercing the corporate veil that the Romanian State was responsible for payment of the judgment against Navimpex and Uz. *See* Complaint at ¶ 2. Prior to any meaningful discovery, plaintiff moved and defendant cross-moved for summary judgment, with plaintiff arguing that Uz was dominated by defendant, and defendant arguing that it was entitled to sovereign immunity under the FSIA. This Court denied both motions at Oral Argument, finding initially that issues of material fact precluded the Court from finding for plaintiff on its theory of piercing the corporate veil between Uz and the Romanian State.[3] *See* Transcript of Oral Argument dated September 6, 1996 ("Oral Arg.") at 7–8, 12. Similarly, this Court found that defendant would not be able to prove its sovereign immunity defense if plaintiff succeeded in proving that the Romanian State was engaged in commercial activities through Uz and Navimpex. *See id.* at 11–12. At the conclusion of Oral Argument and upon denying both motions, the Court made note of the lengthy history of this action, and directed that the parties complete discovery on an "expedited" basis within approximately ninety days, or by December 16, 1996. *See id.* at 13–14. It accordingly denied

defendant's requests for both certification of an interlocutory appeal and a stay of discovery pending its appeal to the Second Circuit.[4] *See id.* at 13.

Upon the failure of its interlocutory appeal, and upon receipt of various discovery demands from plaintiff, defendant through its counsel requested that plaintiff agree to an extension of the Court-ordered discovery deadline to "permit the parties to meet and negotiate" a settlement agreement. Plaintiff's Hearing Exhibit ("Pl. Exh.") 17, Letter from Terry Myers to Bud G. Holman dated November 27, 1996 ("Nov. 27, 1996 Letter"), at 1. To bring forth a full and complete conclusion to this long-outstanding litigation, plaintiff however conditioned its participation in settlement negotiations on the presence of a representative for defendant with full settlement authority. *See* Pl. Exh. 16, Letter from Terry Myers to Bud G. Holman dated December 24, 1996 ("Dec. 24, 1996 Letter"), at 1; Transcript of Proceedings dated July 27–28, 1999 ("TT.") at 15–18. Defendant specifically acknowledged such precondition and suggested a longer extension of discovery in order to "meet [plaintiff's] conditions for both the identification of people to attend the settlement meeting and confirmation that these persons will have the authority to settle." Dec. 24, 1996 Letter at 1.

Based on such discussions, the parties jointly petitioned this Court to provide them with additional time for the completion of discovery. The initial request to this Court for an extension noted that the parties were attempting to settle the action, and added expressly that such additional time was necessary "to arrange a

---

**3.** While the Court found that plaintiff had not submitted sufficient evidence to grant it summary judgment, it did note, however, that plaintiff submitted an uncontradicted affidavit from the former General Manager of Navimpex that had signed the contracts at issue, which set forth persuasive facts indicating that the Romanian Government controlled all major decisions made by Navimpex. *See* Oral Arg. at 4–5, 7–8; *see also* Affidavit of Bud G.

Holman dated August 9, 1996, Exh. B., Translation of Statement by Smarandoiu Vergiliu dated August 8, 1996.

**4.** Defendant nonetheless appealed this Court's denial of its cross-motion for summary judgment, an appeal which was denied as taken from an interlocutory order by order of the Second Circuit dated September 30, 1996.

settlement meeting with representatives of the new [Romanian] government with authority to settle the action." Pl. Exh. 15, Letter from Terry Myers and Bud G. Holman to the Court dated January 9, 1997 ("Jan. 9, 1997 Letter"). at I. On the basis of that representation, the Court granted the parties reprieve from its expedited discovery scheduling order and set a new discovery deadline of April 24, 1997, approximately four months later than that originally ordered. *See* Order dated January 15, 1997. Subsequently, on four separate occasions, this Court was jointly petitioned by the parties by letter for additional time to complete discovery because Court-ordered "discovery [was being] held in abeyance in favor of settlement negotiations." Pl. Exh. 12–14, Letters from Terry Myers and Bud G. Holman to the Court dated April 2, 1997, May 15, 1997 and August 4, 1997. Based both upon the representations in such letters that settlement negotiations were being conducted in good faith and the previous representation to this Court that all parties were represented at the negotiations by persons with full authority to settle this action, this Court consented to each request and accordingly entered three separate orders extending time for the completion of discovery. *See* Orders dated April 7, 1997, May 21, 1997 and August 8, 1997. By virtue of such orders, the parties' discovery schedule was extended into September of 1997, over nine months past the original deadline set by this Court.

At the conclusion of this discovery deadline in September of 1997, the parties again appeared before the Court and requested further extensions because of the pendency of what were represented to be productive settlement negotiations. Based on such representations, and again in reliance upon the parties' joint representation that negotiations were being conducted in good faith and that all parties were represented by individuals who had authority to settle this action, the Court again granted the parties reprieve from its original accelerated discovery order. Rather than providing yet another extension of discovery, the Court at this juncture placed the action on its suspense calendar for a period of approximately ninety days in order to free the parties of all obligations normally undertaken by litigants actively before the Court. *See* Order dated October 21, 1997. Upon several requests by the parties, the Court thereafter extended this suspense period on five separate occasions, bringing the total time of discovery extensions granted by this Court to approximately 22 months. *See* Orders dated January 27, 1998, January 30, 1998, March 20, 1998, June 4, 1998 and August 20, 1998; Pl. Exh. 11, Letter from Terry Myers and Bud G. Holman to the Court dated March 17, 1998.

Upon being notified that plaintiff was experiencing difficulty in obtaining defendant's compliance with the settlement that had been reached, this Court issued an Order dated November 13, 1998 directing that if such settlement was not fully implemented by December 15, 1998, plaintiff would immediately thereafter be given leave to file a motion to enforce such settlement. Upon defendant's failure to comply with the settlement by such date, the instant motion followed.

*The Settlement Negotiations and Settlement*

As Romanian law experts testified before the Court, the Romanian State is represented in virtually all legal matters by the Romanian Ministry of Finance. *See* TT. at 53; *see also* Defendant's Hearing Exhibit ("Def.Exh.") D. The Government of Romania Resolution regarding the organization and operation of the Ministry of Finance, dated August 18, 1997 ("the Finance Ministry Resolution"), at Art. 3(37) ("[T]he Ministry of Finance has the following tasks ... to represent the state, as subject to rights and obligations, before the courts and in any other situation in which the state participates directly, on its own behalf and in legal relationships, if

another body is not appointed by the law."). Romania was therefore represented at the settlement negotiations by its Minister of Finance, Mircea Ciumara. *See* TT. at 7.

Testimony and exhibits before this Court demonstrated that prior to the commencement of negotiations, Mr. Ciumara wrote to the Romanian Prime Minister Victor Ciorbea, providing him with an extensive procedural history of the case, and outlining the options available to defendant in either further pursuing litigation or settling the matter. *See* Def. Exh. DD, Letter from Mircea Ciumara to Victor Ciorbea dated March 21, 1997 ("Prime Minister Letter"), at 3; TT. 68–70. The letter specifically detailed potential problems with the defenses relied upon by defendant, noting that

> [i]n connection with … essential aspect[s] for the adjudication on the merits in this case, we have to admit we are not able to produce documentary evidence based on official documents, as much more contradictory interests appeared between the State and Uzinexportimport, and also as there is a risk of the parties' producing diametrically opposed evidence, which could highlight aspects not favorable to the Romanian State. The unfavorable to Romania precedents in relation with the USA should not be

omitted either (vessels were sequestrated [sic] and so were other assets in view of securing repayment of receivables of third parties).

Prime Minister Letter at 3.

At the conclusion of the letter, Mr. Ciumara explicitly laid out two alternatives, first, continued litigation, or second, settlement, and indicated that the Ministry of Finance had "decided in support of the second alternative." *Id.* at 4. It "[t]herefore ask[ed] [the Prime Minister] to approve the initiation of negotiations, the final decision to be brought to [his] attention after the conclusion of the negotiations." *Id.* The Romanian Prime Minister noted his approval for settlement of the action by placing his seal and signature at the top of the letter, with a notation stating "I agree to the second solution."[5] *Id.* at 1; TT. at. 70.

As consistent with the content of this letter, testimony before this Court demonstrated that Mr. Klaus Francke, a member of the German Parliament and the Romanian–German Parliamentary Group,[6] met the Romanian Prime Minister who referred him to the Finance Minister "to solve the problem in as short [of] time as may be possible" and told him that the Minister of Finance "ha[d] the capacity to discuss the case, to finalize the case, and to

---

**5.** The Romanian Government failed to disclose this letter in its opposition papers to the instant motion, and only produced the letter on the day that the hearing before this Court began. *See* Plaintiff's Post Hearing Memorandum of Law in Support of its Motion for Enforcement of the Settlement Contract dated September 24, 1999 ("Pl. Hearing Mem.") at 2, 10–11. Apparently, plaintiff had noticed a reference to this document in another document the Romanian Government proposed as a hearing exhibit, at which point plaintiff requested the document be produced. *See id.* at 2. Similarly, in his Certification before the United States Consul in Bucharest filed on March 30, 1999, defendant witness Eugen Iordachescu, Central Director of the Legal Department of the Ministry of Finance, failed to mention this letter even though he later admitted to prior knowledge of its existence. *See* TT. at 178–82; Pl. Exh. 5, Certification of

Eugen Iordachescu dated January 1999 ("Iorda Cert.").

**6.** The Romanian–German Parliamentary Group is a collection of parliamentary members who attempt to promote political, cultural and economic ties between Romania and Germany. *See* TT. at 3. By virtue of his participation in such group, Mr. Francke has traveled to Romania ten to twelve times a year since 1980, and knew most of the senior members of the Romanian Government including the head of state, the prime minister and ministers of the cabinet. *See id.* By virtue of his participation in this Group, he was asked by the Secretary of State and Minister of Justice of Germany to attempt to resolve the difficulties in this case faced by plaintiff, a German shipping company, whereupon he met the Romanian Prime Minister to discuss the matter. *See id.* at 4.

sign the settlement." TT. at 5, 12. Similarly, as also demonstrated by testimony before this Court, the Minister of Finance separately told both Mr. Francke and Karl–Wilhelm Koch, President of Seetransport, that he had full authority to settle this action.[7] *See id.* at 4–14, 20, 32, 201. Mr. Francke also testified before this Court that he had discussed the pendency of negotiations or the conclusion of settlement with several members of the Romanian Government, including the Romanian President Constantinescu, the Romanian Minister of Minorities, the Romanian Minister of Health, the Romanian Foreign Minister, the Speaker of the Romanian House, Mr. Ciumara's successor as Finance Minister, Mr. Daianu, as well as officials from the Romanian Ministry of Finance, the Ministry of Law, the Foreign Ministry and their respective legal counsels.[8] *See id.* at 5–10. Mr. Francke testified that on no occasion did any of these individuals indicate that further approvals of a settlement by Finance Minister Ciumara would be necessary for settlement of this action or that Ciumara did not have full settlement authority. *See* TT. at 10–11; *see also id.* at 28, 31–32. 40, 201–03. Defendant did not produce any of these individuals or any other member of its Government at the hearing to rebut such testimony. The Romanian Government was also represented by at least one individual at the settlement negotiations who was present during the Court's hearing on this matter, Mr. Anthony V. Raftopol, a member of the New York Bar and Romanian Counsel to the Finance Ministry and

Ministry of Justice. *See* Transcript of Oral Argument held on November 17, 1999 ("November 17 Arg."), at 46; TT. at 7: Declaration of Karl–Wilhelm Koch in Further Support of Plaintiff's Motion for Enforcement of the Settlement Contract dated February 26, 1999 ("Koch Decl.") at ¶ 16. This individual did not testify at the hearing for reasons not at all clear to this Court.

Settlement negotiations commenced in November of 1996 in Bucharest, Romania. *See* TT. at 5–6. Plaintiff was represented at such negotiations by Mr. Francke, Mr. Koch and Mr. Von Schoepeff, an employee of the German embassy in Romania. *See id.* at 6. The Romanian Government was represented by Finance Minister Ciumara, his lawyer, and representatives of the Minister of Justice and the Foreign Minister, as well as Mr. Raftopol. *See id.* at 7. The parties met multiple times over the next six months, and on April 30, 1997. the Amicable Agreement was signed by Mr. Ciumara on behalf of Romania and Mr. Koch on behalf of Seetransport. *See id.* at 8–9; Pl. Exh. 1, Amicable Agreement ("Amicable Agreement") at 2.

The Amicable Agreement was divided into four sections. The first section, entitled "Preliminary finding" acknowledged that since 1981 plaintiff had an unpaid claim for 16,151,520 DM against the Romanian State, and that the parties "agreed" to the payment stipulations which were outlined in the next three parts of this Agreement. *See* Amicable Agreement at 1. The next section of the Agreement was

---

**7.** Mr. Ciumara was apparently so insistent at the first meeting between the parties that he had settlement authority that both Mr. Francke and Mr. Koch were of the impression that he was offended by such questions. *See* TT. at 8, 20.

**8.** Mr. Koch stated that he spoke with the Minster of the Minorities and the Minister of Health in order to discuss provisions of the settlement discussed *infra* that stipulated plaintiff would contribute sums to charitable government institutions administered by these Ministers. *See* TT. at 8. He also stated that he

spoke with other members of the Romanian Government, and in particular Romanian President Constantinescu, to inform him of the completion of the settlement and the benefits to the Romanian State in stabilizing its commercial relations with Germany. *See id.* at 9. Mr. Constantinescu apparently noted at multiple public appearances in Germany over the next months that problems associated with this matter had been resolved through settlement and that he hoped this would spur more German investments in Romania. *See id.* at 10.

entitled "Payments in Cash," and stated that "[t]he payment in cash in amount of 8,000,000.00 [DM] shall be carried out by the Government of Romania" over four years, in amounts specified in the document for each year. *Id.* at 2. The next section of the Agreement entitled "Humanitarian Projects" stated that in 1997, "the Government of Romania shall make a payment of an amount equivalent in Lei to DM 500,000" to bank accounts funding two Romanian charitable projects, the "Betterment of Teachers in Medias" and the "Pediatric Clinic of Timisoara." *Id.*

Finally, as stipulated in the fourth section of the settlement contract entitled "Transfer of the ownership of land," the Romanian Government was to transfer to Seetransport a certain land parcel in Bucharest ("the Bucharest Land Parcel"), specifically, "lot No. 85.85, in accordance with the entry in the Cadastral Register of the Bureau of Land Records of the city of Bucharest, pertain[ing] to the lot of land located on Kisseleff Road." *Id.* at 3. The settlement contract estimated the value of this land to be at DM 3,000,000, but provided that a certified expert hired by the German Embassy was to appraise its real value. *See id.* Such appraisal would be "considered as binding for both parties," and this section further provided that the Romanian State would be responsible for all construction approvals on the land. *Id.*

Upon appraisal by a German expert in the following months, the Bucharest Land Parcel was revalued at 6,000,000 DM, or 3,000,000 DM more than was originally estimated. *See* TT. at 30–31. To incorporate this valuation into the overall settlement amount, Mr. Ciumara and Mr. Koch subsequently signed an "Attachment to the Amicable Agreement" on August 20, 1997 ("the Attachment") in Bucharest. *See* Pl. Exh. 2, Attachment dated August 20, 1997, at 1. The Attachment made the "Preliminary Observation" that the cash payments

of 8,000,000 DM to be made by Romania pursuant to the Amicable Agreement "w[ould] decrease" so that instead "[c]ash payments representing DM 5,000,000 shall be paid by the Government of Romania." *Id.* The Attachment also provided specific boundaries for the land to be transferred pursuant to the Amicable Agreement and stated explicitly that such land "shall be transferred into the ownership of the firm Wiking Trader not later than the middle of the month of September 1997." *Id.* at 2.

The Attachment also included a provision entitled "Notification of the Resolution of the Government." This provision, as translated into English, states that:

A copy of the Resolution taken by the Government concerning the acceptance of the Amicable Agreement, and of the transfer of ownership of the above described lot of land shall be forwarded by a notification through the office of the Prime Minister or of the Foreign Minister of Romania to the Embassy of Germany in Bucharest, which, subsequently, shall confirm the receipt of such notification. Then, the Embassy of Germany in Bucharest shall forward this copy of the Governmental Resolution through the intermediary of the Foreign Ministry, to the firm Wiking Trader in Hamburg.

*Id.*

In the Romanian version of this agreement, the term *"hotarare de govern"* is used in place of the word "resolution." The parties agree that a *hotarare de govern* is a government resolution which requires adoption by a majority of Romanian ministers in a Cabinet meeting with at least one-third of the cabinet, or eight ministers, in attendance.[9] *See* TT. at 74–75, 99–100. According to the uncontested testimony of Mr. Koch, this provision was added at the suggestion of the German Embassy without any prompting or request by Romanian negotiators. *See id.* at

---

9. Such cabinet, at times relevant to this lawsuit, was composed of between eighteen and twenty-three members. *See* TT. at 74–75, 99.

29–30, 41,200–02. In this respect, Mr. Koch stated in sworn testimony before the Court that prior to and during the negotiations, no Romanian official ever requested this provision and, similarly, no Romanian official told any member of the negotiating team for Seetransport that the Resolution was necessary for the settlement to be legally binding under Romanian law. *See id.* Rather, as Mr. Koch noted in uncontested testimony before this Court, such provision was added only to address plaintiff's concern that for political reasons, a new Government in Romania might not feel obliged to honor the settlement agreement.[10] *See id.* at 41.

Finally, the Attachment included a provision that stated "a[n] integral [sic] part of the Amicable Agreement shall also be the Release written on the date of 8/20/97 by the firm Wiking Trader, by which it renounces all claims toward the Romanian party." Attachment at 2. The Attachment further indicated that "it is agreed that the attorneys in New York of the parties concluding this Agreement … shall be requested to put an end to all juridical disputes." *Id.* at 2. Accordingly the parties contemplated that "it should not be necessary [to] present[ ] the Amicable Agreement, and its completion [to] the Court [for approval]." *Id.* The Release itself was signed only by Mr. Koch for Seetransport and stated that plaintiffs would consent to the release of all claims in this action. It further stated that:

> [a]ny and all disputes relating to the rights, duties, obligations or enforcement of … the attached Deed of Settlement setting forth the terms of the settlement shall be governed by the law of the State of New York, without reference to a foreign law in any case, and any such dispute shall be resolved in the

United States District Court, Southern District of New York.

Pl. Exh. 3, Release dated August 20, 1997 ("Release") at 1.

In early 1998, Minister of Finance Ciumara informed Seetransport that, apparently unbeknownst to the parties, Romanian law prohibited transfers of land owned by the Romanian State to foreigners. To enable the Government to transfer the land, plaintiff was therefore notified by Ciumara that it would be required to establish a Romanian-registered company to legally own the land. *See* Pl.'s Hearing Mem. at 9. Mr. Koch thereafter took steps necessary to create a Romanian-registered company and soon succeeded in this pursuit. *See* TT. at 42. This company, however, never took control of the land, as it was ultimately found that the land did not belong to the Romanian Government, but instead to the City of Bucharest. *See id.* at 42, 103, 106, 150, 202. Despite such difficulties in implementation, however, again, no indication was given to plaintiff by Mr. Ciumara or any other Romanian official that any further approvals were necessary for the settlement to take effect or that the Romanian Government did not intend to fulfill its obligations under the Agreement or Attachment. *See* Pl. Hearing Mem. at 9; TT. at 31.

Shortly thereafter, however, the Romanian Government asserted that the settlement was not binding and was unenforceable without the passage of an *hotarare de govern.* According to testimony of Eugen Iordachescu, defendant's Romanian law expert and Legal Director of the Romanian Finance Ministry, beginning near the end of 1997, the legal department of this Ministry attempted on at least two occasions to obtain approvals for such settlement, attempts which apparently failed. *See* TT. at 139–42. Accordingly, Romania

---

**10.** Approximately fifteen months after the Attachment was executed, the Romanian parliament passed Decree No. 272 of 1998 which contained a ratification of the "guarantee extended by the Romanian State for the outstanding debt of German company 'Seetrans-

port Wiking Trader.'" Pl. Exh. 23, Decree No. 272 of 1998 at 6. This decree constituted parliamentary approval of the settlement, but did not meet the technical requirements of a *hotarare de govern.*

refused to make payments or transfer land as stipulated in the Amicable Agreement and Attachment, and plaintiff thereafter filed the instant motion to enforce such contracts.

Following its receipt of the instant motion and the opposition thereto, this Court scheduled a hearing to judge the credibility of claims made by parties relating to the conduct of negotiations and the applicability and substance of Romanian law. During such hearing, the Court heard testimony from several witnesses for plaintiff including Mr. Klaus Francke and Mr. Karl–Wilhelm Koch, President of Seetransport, who testified as to the substance of the settlement negotiations between the parties, and Mr. Laurentiu Pachiu, an expert in Romanian law. The Romanian Government failed to produce a single fact witness at this hearing, and in particular, produced no witnesses that were present at any of the lengthy settlement negotiations between the parties. Similarly, defendant failed to present the deposition testimony of any witnesses present at the negotiations in Romania, nor did it present any certification or affidavit from such witnesses.[11] *See id.* at 135–36. Defendant instead introduced and relied upon only one witness at trial, Eugen Iordachescu, a legal expert and General Director of the Legal Department of the Ministry of Finance of Romania. As noted by Mr. Iordachescu in his testimony, he assumed his position as General Director of the Finance Ministry fourteen months after the settlement contracts at issue in this litigation were executed. *See* Pl.'s Hearing Mem. at 12; TT. at 117–18.

**11.** Counsel to defendant has stated that it could not depose the current Finance Minister who replaced Finance Minister Ciumara because of a short deadline for trial, although defendant did not ask for an adjournment of such hearing in order to secure such testimony by appearance at the hearing, by deposition, or otherwise. *See* TT. at 135–36. Similarly, defendant made only vague attempts to explain its failure to produce Mr. Ciumara, noting only that he was no longer in their

## CONCLUSIONS OF LAW

■ This Court must initially determine whether to apply New York or Romanian law in assessing the enforceability of the settlement contracts at issue. In non-federal question disputes brought under the FSIA, the Second Circuit has held that Courts should apply the substantive law of the forum state, including its choice of law rules. *See Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 12–13 (2d Cir. 1996); *Barkanic v. General Admin. of Civil Aviation of the People's Republic of China,* 923 F.2d 957, 959–60 (2d Cir.1991). Under New York law, "[a]bsent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." *International Minerals and Resources, S.A. v. Pappas,* 96 F.3d 586, 592 (2d Cir. 1996); *Bossier Plaza Associates Ltd. Partnership v. Pierson,* 156 A.D.2d 246, 246, 548 N.Y.S.2d 507 (N.Y.App.Div.1989).

■ As noted above, the Release, which was incorporated into the Amicable Agreement as "an integral part" of this document, stated that "any and all disputes relating to the ... enforcement of this Release and the attached Deed of Settlement ... shall be governed by the law of the State of New York, without reference to a foreign law in any case." Release at 1. While such language appears to clearly express the parties' intent that New York law should apply in the instant dispute, defendant argues that the Release was in draft form and signed only by plaintiff, and therefore cannot be construed as part of

control and that "he had important issues to resolve." Defendant Romania's Post Hearing Brief in Opposition to Plaintiff's Motion to Enforce the Amicable Agreement with Attachment dated September 24, 1999 ("Def. Hearing Brief") at 24. Finally, as noted above, Mr. Raftopol, a participant in the negotiations, was actually present at both the settlement conferences and the hearing but was never called to testify by defendant.

the Amicable Agreement or Attachment. This Court, however, finds such argument entirely without merit, because the Attachment (which defendant executed) refers to the Release as "an integral part" of the Amicable Agreement and explicitly references the Release as dated and executed by plaintiff alone. *See* Attachment at 2 ("A[n] integral part of the Amicable Agreement shall also be the Release *written on the date 8/20/97 by the firm Wiking Trader.*") (emphasis added); Release at 1. Defendant's arguments are also incredulous given that it presented absolutely no testimony to the Court to substantiate its claim that the Release was fraudulently incorporated or executed.

■ The Court is therefore obliged to give full force to the parties' choice of law provision, absent any substantive allegation of fraud or violation of public policy. Moreover, New York has ample contacts with the settlement contracts at issue here, because such settlement was prompted by twelve years of seemingly endless litigation before this New York-based Court. *See also Penn Columbia Corp. v. Cemco Resources, Inc.,* No. 88 Civ. 0667, 1990 WL 6555 at *2 (S.D.N.Y. Jan. 22, 1990). Indeed, New York State has a strong policy interest in regulating settlement agreements and in reducing its courts' caseloads through settlement, particularly when parties have requested and received multiple extensions of time in order to effectuate settlement.[12]

In any event, Romanian law would also recognize this choice of law provision and apply New York law to the settlement contract. Plaintiff expert witness Pachiu, whom this Court finds fully credible, testified that Romanian law recognized both the doctrine of incorporation and choice of law provisions like that present here. *See* TT. at 206. Similarly, defense expert Ior-

dachescu stated that a Romanian court would enforce the choice of law provision so long as it was properly incorporated into the contract. *See id.* at 171–72. While Iordachescu claimed that this choice of law provision could not be incorporated into the Amicable Agreement because the Release was unsigned, this Court finds such testimony without merit. This conclusion is warranted both in light of Mr. Pachiu's testimony to the contrary and the general doctrine under Romanian law that clauses, like that incorporating the provisions of the Release, should be interpreted in such a way as to be effective rather than having no effect. *See id.* at 170–71, 206. Moreover, as discussed *infra*, this Court finds Mr. Iordachescu's credibility highly suspect given his interest in the outcome of the action, the substance of his testimony, and his failure to provide crucial, relevant details in his certification to this Court.

*Actual Authority*

■ Defendant argues that this Court may not enforce the Amicable Agreement because Finance Minister Ciumara did not have authority to settle this action. Under New York law, actual authority is the authority that a principal invests in its agent, which, upon its exercise, binds the principal. *See Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,* 51 F.Supp.2d 457, 472 (S.D.N.Y.1999) (Edelstein, J.). Actual authority may be established by any action that reasonably indicates to the agent that the principal wants the agent to perform a certain task. *See id.* The scope of the agent's actual authority may be explicitly stated or, alternatively, inferred from all circumstances including business customs, subject matter, formal agreements between the parties, any facts known to both parties, or omissions by the principal. *See id.* at 472. Moreover, certain agents possess authority which is "inherent" or "inci-

---

12. While defendant argues that Romanian law must apply to this dispute because the settlement involves real property located in Romania, this Court may apply New York law when it is not asked to determine title to

property, but rather for monetary damages pursuant to covenants between the parties. *See Selover, Bates & Co. v. Walsh,* 226 U.S. 112, 124, 33 S.Ct. 69, 57 L.Ed. 146 (1912); *In re Barnett,* 12 F.2d 73, 77 (2d Cir.1926).

dental" to the ordinary scope of authority associated with their position. Such implied authority may be inferred "solely from the designation of the principal of a kind of agent who ordinarily possesses certain powers." *Marfia v. T.C. Ziraat Bankasi,* 100 F.3d 243, 251 (2d Cir.1996) (citations omitted); *Gumpert v. Bon Ami Co.,* 251 F.2d 735, 738 (2d Cir.1958). In such circumstances, the burden is on the principal to inform third-parties of any unexpected limits on the agent's authority.

■ Ample evidence before this Court demonstrates conclusively that Finance Minister Ciumara was invested with the authority necessary to execute and bind the Romanian State to the settlement contracts at issue. The Romanian Finance Ministry has a specific mandate to represent the Romanian State in legal matters, both through Decrees and Governmental resolutions. *See e.g.* Pl. Exh. 32, Romanian Decree No. 31/1954 ("The State shall be a legal person in the relationship into which it participates directly, on its own behalf, as a party subject to rights and obligations. The State shall participate in such relationships through the Ministry of Finance, except those cases in which the law appoints other bodies to this effect."); Pl. Exh. 21, Law No. 447/1997, Art. 3 at ¶ 37 (noting that the Ministry of Finance shall "represent the State, in matters of rights and obligations, in a court of law, and in any other situation in which the State is participating directly, pro se, in juridical matters."). As credibly testified to by plaintiff's Romanian law expert, such resolutions evidence a Romanian policy whereby in legal matters the Finance Ministry takes on the responsibilities of the State itself, with the Finance Minister fully capable of executing a binding settlement on the State's behalf. *See* Pl. Exh. 21, 32, 34; TT. 52–54, 59–60, 67, 95, 210–11, 213–16, 219–23.

The conduct of every Romanian official who was associated with this litigation and its ultimate conclusion through settlement also evidences the actual authority of the Minister of Finance to settle this action. Testimony and exhibits before this Court demonstrated that the Romanian Prime Minister referred Mr. Francke to the Finance Minister with the express purpose of "solv[ing] the problem in as short [of] time as may be possible" and told him that the Minister of Finance "ha[d] the capacity to discuss the case, to finalize the case, and to sign the settlement." *See id.* at 5, 12. Similarly, Mr. Francke testified before this Court that he had discussed the pendency of negotiations with a multitude of high level officials in the Romanian Government, including Romanian President Constantinescu, the Romanian Minister of Minorities, the Romanian Minister of Health, the Romanian Foreign Minister, the Speaker of the Romananian House, Mr. Ciumara's successor as Finance Minister, as well as officials from the Romanian Ministry of Finance, the Ministry of Law, the Foreign Ministry and their respective legal counsels. *See id.* at 5–10. Mr. Francke, who this Court finds fully credible, stated that on no occasion did any of these governmental representatives indicate that Ciumara did not have full settlement authority or that further approvals of a settlement reached by him would be necessary. TT. at 10–11. These facts are especially persuasive since these discussions by Mr. Francke were directly relevant to the settlement's provisions and/or the effect of the completion of the settlement on German–Romanian trade relations.[13]

---

**13.** As noted above, Mr. Francke stated that he spoke with the Minster of the Minorities and the Minister of Health in order to discuss with them provisions of the settlement specifically related to charitable giving to institutions under their control. *See* TT. at 8. He also stated that he spoke with the other members of the Romanian Government, and in particular Romanian President Constantinescu, to inform him of the completion of the settlement and the benefits to the Romanian State in stabilizing commercial relations between the states. *See id.* at 9. Mr. Constantinescu, at multiple public appearances in Germany over the next

The Court is also mindful that defendants have failed to produce a single fact witness to rebut this crucial and credible testimony, including the Romanian officials with whom Mr. Francke spoke or other governmental officials and representatives present at the settlement negotiations. While defendant argues that it was incapable of securing the attendance of at least some of these witnesses, the Court finds it incredible that the Government of Romania, a sovereign nation with control over its Government representatives and citizens, could not compel any member of its Government present at the negotiations to appear for a deposition or the hearing before this Court.[14] *See id.* at 135–136. As such, this Court must draw an adverse inference against defendant for its failure to rebut any such testimony, particularly in light of the credible testimony presented by plaintiff and defendant's clear understanding of the issues to be addressed by the Court at its hearing.[15] *See N. Sims Organ & Co. v. S.E.C.*, 293 F.2d 78, 80–81 (2d Cir.1961); *Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*, 486 F.Supp. 414, 433 (S.D.N.Y.1980).

Defendant nonetheless argues that Ciumara did not have authority to settle this action as demonstrated by the Attachment's reference to an *"hotarare de govern"* which "was to be taken by the [Romanian] Government concerning the acceptance of the Amicable Agreement."

Attachment at 2. As described above, an *"hotarare de govern"* is a Romanian Government resolution which is adopted by a majority of Romanian ministers in a Cabinet meeting with at least one-third of the cabinet, or 8 ministers, in attendance. *See* TT. at 74–75, 99–100. Defendant insists that the reference to an *hotarare de govern* demonstrated that all parties to the negotiations were aware that further approvals of the settlement would be necessary, and, as such, the Finance Minister's role in negotiations was simply that of a negotiator who was required to forward the settlement to the body of Ministers for further discussion and possibly approval.

Upon hearing the testimony and examining the submissions before it, this Court finds that defendant's argument concerning the necessity of an *hotarare de govern* to be wholly untenable. At the outset, it is important to note that the Amicable Agreement, the first and most extensive component of the parties' settlement stipulation, contains absolutely no reference to an *hotarare de govern* or any other approvals that were necessary for settlement of this action. At no time during the negotiations of the Amicable Agreement, a period that lasted six months, or the discussions preceding such negotiations did either party indicate that an *hotarare de govern* or any further approvals would be

months, apparently stated that problems associated with this matter had been resolved through settlement and that he was excited at the possibility of more German investments in Romania. *See id.* at 10.

**14.** Defendant's arguments that it could not procure any witness to testify on its behalf are particularly disingenuous given that a member of the Romanian negotiating team appeared in Court to witness these proceedings and was never called to testify to refute allegations made by plaintiff that were directly contrary to the facts and legal claims made by defendant. *See* TT. at 7, 198; Nov. 17 Arg. at 46.

**15.** The conduct of counsel to Romania similarly evidences the power of the Ministry of Finance to bind the Romanian State to the

settlement contract at issue. In several letters both to the Court and plaintiff's counsel, counsel to defendant explicitly recognized plaintiff's precondition on settlement discussions that defendant be represented by individuals who had full settlement authority. *See* Nov. 27, 1996 Letter, Dec. 24, 1996 Letter, January 9, 1997 Letter. It accordingly represented that it would endeavor to meet this condition, and ultimately, upon conferring with its client, presented Mr. Ciumara at such discussions in Bucharest. Given such communications, the Court can reasonably infer from counsel's conduct that the Romanian Government itself presented Mr. Ciumara as a person with authority to enter into a binding settlement agreement.

necessary to bind the Romanian State. In fact, to the contrary, the Amicable Agreement is framed in absolute and conclusive terms, stating that the parties "agreed" to a payment of 16,151,520 DM and that payments "shall be carried" out on a specific time schedule to specific individuals and institutions. Amicable Agreement at 1–2.

Moreover, as testified to by witnesses to plaintiff who this Court finds fully credible, at no time prior to or during negotiations of the Attachment, which occurred four months after the Amicable Agreement was executed, did the Romanian Government mention the need for additional approvals in the form of an *hotarare de govern* or otherwise. *See* TT. at 29–31, 40–41, 200–02. Indeed, the provision relating to an *hotarare de govern* was inserted into the Attachment at the latest possible moment and solely at the suggestion of a German negotiator as merely an afterthought to discussions regarding the value of land to be transferred. *See id.* Nor is there any evidence establishing that the German Government or plaintiffs believed that such Resolution was necessary to bind the Romanian State. In fact, such Resolution was viewed simply as additional political leverage to ensure that the Romanians would honor the obligations into which they had already entered. *See id.* at 40. Similarly, there is no evidence establishing that the language referring to an *hotarare de govern* was viewed as nec-

essary by any Romanian party or was even included at its request. The Court concludes therefore that the language referencing an *hotarare de govern* did not deprive Mr. Ciumara of authority to enter into the settlement contracts at issue and it follows that such settlement was effective as of its execution.[16]

While defendant's witness Mr. Iordachescu argued that the Finance Ministry's attempts to secure governmental resolutions approving the Agreements demonstrated that the Finance Ministry could not bind the Romanian State, these attempts are not inconsistent with this Court's conclusion that an *hotarare de govern* was designed as political security rather than as a restriction on Mr. Ciumara's authority. Of more significance is the fact that only as late as January or February of 1999, after this Court had set a briefing schedule for the instant motion to enforce the settlement contracts, did defendant claim that Mr. Ciumara did not have authority to settle this action and that further approvals were necessary. *See* TT. at 32. Additionally, this Court finds Mr. Iordachescu lacked credibility as an expert both in light of his interest in the action as an employee of the Romanian Finance Ministry, and, more importantly, because of his consistent failures to attach crucial and relevant documents and translations to his sworn certification and testimony before this Court.[17] The Court also notes

---

**16.** Similarly, contrary to defendant's assertion, this Court finds that an *hotarare de govern* was not a condition precedent to the parties' obligations under the settlement contract. The language of the Attachment itself simply requires that this resolution "concerning acceptance" of the Agreement should be forwarded to the German embassy. If these sophisticated parties intended an *hotarare de govern* to be a condition precedent to the validity of the settlement they could have explicitly so provided. *See* Attachment at 1; TT. at 29–30, 135–136. The same reasoning applies with respect to defendant's contention that under Romanian law the provision referencing an *hotarare de govern* transferred this settlement contract from a concrete "obligation to give" to an "obligation to do," or a mere covenant to

use best efforts to bring forth the conclusion of the settlement. *See* TT. at 148–150.

**17.** For example, as described *supra*, prior to the commencement of negotiations, Finance Minister Ciumara sent a letter to the Romanian Prime Minister which outlined the Romanian litigation posture and recommended settlement of this action. *See* Prime Minister Letter at 2. The Romanian Prime Minister noted that he "agree[d]" with this recommendation in a written notation made directly on the letter. *See id.* When Mr. Iordachescu was questioned why he did not include a discussion of this critical document in his certification (a sworn statement that detailed his position that the Finance Minister did not have settlement authority), he said he "con-

that Mr. Iordachescu is not qualified as a fact witness to testify as to the intent of the parties, as he was not present at the negotiations and was in fact not employed by the Finance Ministry at the time the settlement was reached.[18] *See* TT. at 117–18.

Finally, given the representations made to this Court regarding Ciumara's authority and the benefits defendant obtained thereby, defendant may not now argue that Ciumara did not have such authority. Judicial estoppel is a rare remedy that is used to protect the sanctity and integrity of the judicial system. *See United States v. Hussein,* 178 F.3d 125, 130 (2d Cir.1999); *Simon v. Safelite Glass Corp.,* 128 F.3d 68, 71 (2d Cir.1997). To this end, judicial estoppel demands truthful and consistent statements from litigants in order to avoid inconsistent outcomes and to prevent litigants from abusing the power of the Court. *See Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 98 (2d Cir.1997). Before asserting judicial estoppel, a Court must find that "the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding" and that the Court has accepted the previous assertion in some manner. *AXA Marine and Aviation Ins. (U.K.) Ltd. v. Seajet Indus. Inc.,* 84 F.3d 622, 628 (2d Cir.1996).

Defendant here gained numerous advantages by virtue of its representations to this Court that it would enter settlement negotiations in good faith and with an agent that possessed full settlement authority. As detailed above, the Court placed this action on an accelerated discovery schedule upon the denial of the parties' motions for summary judgment, an action which the Court believed was warranted given the narrow issues presented by the case, the relative strength of plaintiff's position, and an extensive history of the Romanian-based defendants shirking their obligations under contract. Indeed, given that this dispute had been ongoing for approximately eighteen years, this Court was willing to postpone the matter's prosecution only by virtue of defendant's representation, made through an officer of this Court, that it needed additional time to find an individual with "authority to settle this action." *See* December 24, 1996 Letter at 1. Based upon such representation, this Court entertained request after request from defendant for extensions of discovery, and ultimately placed the action on its suspense calendar in order that the parties could focus exclusively on settlement without any of the burdens typically associated with an actively-prosecuted action. In sum, Court-ordered relief was extensive and generous, with the Court providing the parties with approximately ten extensions of time for a period of two years in order that they might settle this action rather than face an accelerated discovery schedule.

---

sidered [the letter] not a very important document that I should get into a broad legal discussion about." TT. at 180. Similarly, in arguing that the Finance Minister did not have settlement authority, Mr. Iordachescu quoted without translation Article 14 of Romanian Law 37/1990 as providing that "all contracts under which the State assumes an obligation ... must [be] submit[ted] for approval to the Government, and the Government must give its approval." Iorda Cert. at ¶ 9. Upon being provided with a translation of such Article by plaintiff, this Court became aware that such Article made no such direct statement, and to the contrary that any interpretation provided by Mr. Iordachescu was made wholly by inference from the provisions of such Article. *See* Letter from Paul F. Doyle

to the Court dated July 26, 1999 at 1–2; TT. at 184–85, 187–88; Pl. Hearing Mem. at 10–11.

**18.** While defendant argues that the letter from Finance Minister Ciumara to the Romanian Prime Minister also demonstrates that additional approvals were in fact necessary, such letter merely demonstrates that the Prime Minister "agree[d]" that settlement should be pursued, and, in accordance with the terms of such letter, the Finance Minister was to make "the final decision ... after the conclusion of the negotiations." Prime Minister's Letter at 1, 4. After such decision was made, it would only then be brought "to the attention" of the Prime Minister. *See id.* at 4.

■ In such circumstances and at this late juncture, the Court must wholly disregard defendant's arguments that its Finance Minister did not in fact possess the authority he was represented to have. This conclusion is necessary to protect the integrity of this Court's rulings and to place litigants on full notice that they may not obtain the Court's leniency by virtue of false representations regarding their capacity and intent to settle. As such, defendant is judicially estopped from asserting that its Finance Minister did not have actual authority to settle this action, and the provisions of such settlement must therefore be enforced.

*Apparent Authority*

■ Even if Mr. Ciumara did not have authority to settle this action, this Court also finds that he possessed apparent authority by virtue of representations made by his principal, the Romanian Government, to plaintiffs. An agent has apparent authority when his principal represents through words or acts to a third party that the agent has the principal's consent to perform a certain action. *See Minskoff v. American Express Travel Related Servs.*, 98 F.3d 703, 708 (2d Cir.1996).

The evidence in this case amply supports that at the very least Mr. Ciumara had apparent authority to finalize the settlement at issue. Such authority was demonstrated in letters to both this Court and plaintiffs in which defendant, through its counsel, represented that it would present a person with full settlement authority at settlement discussions. *See* November 27, 1996 Letter; December 24, 1996 Letter; January 9, 1997. Such consent was also demonstrated in the multitude of discussions between Mr. Francke and senior Romanian officials as outlined above. TT. at

8–11. Indeed, the Romanian Prime Minister—the senior most policy official in the Romanian Government—explicitly told Mr. Francke that the Romanian Minister of Finance "ha[d] the capacity to discuss the case, to finalize the case, and to sign the settlement." *Id.* at 12. Such facts coupled with defendant's failure to make any representation during the entire course of negotiations that would at all suggest that the Finance Minister did not have such authority, made it entirely reasonable for plaintiff to have relied upon such representations. This Court also finds that given such representations by Mr. Ciumara's principal, no further inquiry in this matter was necessary, and accordingly the Romanian State is bound by the settlement contracts as executed by this agent. *See id.* at 28, 31–32, 40, 201–03.[19]

*The Land Transfer*

Finally, defendant argues that the Amicable Agreement and Attachment is unenforceable because they contemplate transfer of land that is not actually in defendant's possession. Under the settlement, Romania was obligated to transfer "land comprising an area of 4,500 square meteres" located on Kisseleff Road in Bucharest in lieu of part of its cash payment to plaintiff. *See* Amicable Agreement at 2. At the time of the contract's formation, the parties apparently believed that this parcel of land was owned by the Government of the State of Romania and that it could be transferred to plaintiff. However, as the parties now agree, the land was in fact owned by the City of Bucharest and, in any event, the Romanian Constitution prohibits the transfer of land to foreigners.

■ Under New York law, upon breach of contract, a wronged party may

---

**19.** Romanian law recognizes an even broader doctrine of apparent authority, appearing to bind a party in some circumstances simply by virtue of the agent's representations. *See* TT. at 208–209. Defendant presented no testimony to rebut this analysis of Romanian law other than to claim that the provision discuss-

ing an *hotarare de govern* demonstrated that Mr. Ciumara could not have possessed apparent authority. As discussed above, this Court finds no merit in defendant's arguments that such provision divested Mr. Ciumara of authority or constituted a condition precedent to the contractual obligations at issue.

generally seek either specific performance or damages. When specific performance is impossible, a plaintiff may sue for damages. This doctrine is applicable in a case involving the transfer of title which is in fact not owned by the transferor. *Elliott v. Asiel,* 120 A.D. 829, 105 N.Y.S. 655, 656–57 (1st Dept.1907) ("[A]n individual, without title to property [who] enters into a contract to sell and convey it . . . cannot avoid the consequences of his contract by subsequently informing the purchaser that he had not title to the premises."); *see also Joneil Fifth Ave. Ltd. v. Ebeling & Reuss Co.,* 458 F.Supp. 1197, 1201 (S.D.N.Y. 1978). Similarly, under Romanian law, this Court finds damages are available even if the land transfer was impossible due to either lack of ownership or provisions restricting such transfer to foreigners under the Romanian Constitution. *See* Pl. Exh. 20, Civil Code, Art. 1073 ("The creditor is entitled to obtain specific performance of an obligation is otherwise entitled to compensation."); TT. at 63, 208.[20] As such, this Court must give effect to the provisions of the contract transferring the land by awarding plaintiff damages equal to its value as appraised. Such calculation is particularly appropriate in the circumstances present here, where the parties agreed upon a total monetary value of the settlement, with the value of the land to be considered as only one component of this aggregate amount. *See* Amicable Agreement at 1.

## CONCLUSION

For the foregoing reasons, this Court finds that defendant is bound by the terms of the Amicable Agreement and Attachment and is hereby ordered to pay the

**20.** While Romanian expert Iordachescu claimed that damages in lieu of specific performance were inappropriate in these circumstances, much of his argument rested on the faulty assumption that the Amicable Agreement was never enforceable because of defendant's failure to obtain an *hotarare de govern. See* TT. at 174. Similarly, while Iordachescu claimed that a contract dependant upon an impossibility or action prohibited by law is

equivalent of 16,151,520 DM in United States dollars at the prevailing rate on the date of entry of this Memorandum Opinion and Order. The Clerk of the Court is directed to enter judgment accordingly and to close the above-captioned action.

null and void, he admits that if the contract was properly completed with proper approvals, monetary damages would be available in lieu of specific performance. *See id.* at 175–176. As this Court has concluded that neither an *hotarare de govern* nor any other approval was necessary to bind defendant, damages are therefore appropriate even under defendant's analysis of Romanian law.