383 F.Supp.2d 566 (2005)
In re: INITIAL PUBLIC OFFERING SECURITIES LITIGATION
This document relates to:
Amy Liu, Robert Tenney, Robert Tate, Mary Gorton, Carla Kelly, Henry Ciesielski, Ed Grier, Frank Turk, Jennie Papuzza, Stanley Warren, Ellen Dulberger, Craig Mason, and Sharon Brewer, Plaintiffs,
v.
Credit Suisse First Boston Corp., Credit Suisse First Boston (USA), Inc., Credit Suisse First Boston, Credit Suisse Group, Efficient Networks, Inc., eMachines, Inc., Lightspan Partnership, Inc., Tanning Technology Corp., and Tumbleweed Communications Corp., Defendants.
No. MDL 1554SAS, No. 21 MC 92SAS, No. 04 Civ. 3757(SAS).
United States District Court, S.D. New York.
April 1, 2005.
*567 *568 *569 John G. Watts, Yearout & Traylor, P.C., Birmingham, AL, for Plaintiffs.
Kristin Linsey Myles, Robert L. Dell Angelo, Munger, Tolles & Olson LLP, San Francisco, CA, Michael L. Hirschfeld, Daniel M. Perry, Joo Yun Kim, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, Randall J. Clement, Sheppard, Mullin, Richter & Hampton LLP, Costa Mesa, CA, Mitchell E. Herr, Holland & *570 Knight LLP, Miami, FL, for Issuer Defendants.
Peter K. Vigeland, Robert W. Trenchard, Wilmer Cutler Pickering Hale & Dorr LLP, New York, NY, for CSFB and Swiss Defendants.

OPINION AND ORDER
SCHEINDLIN, District Judge.
I. INTRODUCTION
Although this case is included in the coordinated In re Initial Public Offering Securities Litigation proceedings, it arises from a very different set of allegations. Plaintiffs' allegations are set forth at length in my Opinion of June 8, 2004.[1] Familiarity with that Opinion is assumed. Essentially, plaintiffs allege that defendants, an investment bank and several issuers of securities that went public during the technology boom of the late 1990s, defrauded investors by setting their earnings estimates below their true estimates, and thereby created excitement in the marketplace when the stocks at issue beat estimate after estimate, conditioning the market to expect superior performance from those stocks and artificially inflating their prices.[2] This argument, which posits that stock prices can be inflated by artificially understating earnings estimates, has been challenged by defendants in numerous motions to dismiss.[3] All of those motions are resolved in this Opinion.
While defendants make several arguments in support of their contention that plaintiffs' complaint should be dismissed, one particular argument  that plaintiffs' causation allegations are flatly contradicted by objective fact  is pivotal. If plaintiffs fail to allege that defendants' scheme actually caused their losses, then other questions about the sufficiency of the complaint are irrelevant.[4] Accordingly, this *571 Opinion will address only the threshold question of whether plaintiffs have adequately alleged causation.
II. FACTS[5]
A. The Parties
Plaintiffs allege that the following named plaintiffs purchased securities of various issuers in the open market during each relevant Subclass Period:[6] Amy Liu purchased an undisclosed number of Commerce One securities; Antoine Kasprzak purchased 1,000 shares of Airspan Networks, Inc. ("Airspan") securities; Robert Tenney purchased over 20,000 shares of Commerce One, Inc. ("Commerce One") securities; Robert Tate purchased 10,000 shares of Bsquare Corp. ("Bsquare") securities; Mary Gorton purchased 5,350 shares of CacheFlow, Inc. ("CacheFlow") securities; Carla Kelly purchased 3,500 shares of Efficient Networks, Inc. ("Efficient Networks") securities; Henry Ciesielski purchased 200 shares of eMachines, Inc. ("eMachines") securities and 45 shares of McData Corp. ("McData") securities; Ed Grier purchased 7,900 shares of E.piphany, Inc. ("E.piphany") securities; Frank Turk purchased 200 shares of Handspring, Inc. ("Handspring") securities; Jennie Papuzza purchased 200 shares of InterNAP Network Services Corp. ("InterNAP") securities; Stanley Warren, as trustee for the Warren Family Trust, purchased 1,000 shares of Lightspan Partnership, Inc. ("Lightspan") securities; Ellen Dulberger purchased 1,000 shares of SupportSoft, Inc., formerly Support.com, Inc. ("SupportSoft") securities; Craig Mason purchased 500 shares of Tanning Technology Corp. ("Tanning") securities; and Sharon Brewer purchased over 4,000 shares of Tumbleweed Communications Corp. ("Tumbleweed") securities.[7]
Defendant Credit Suisse First Boston Corp. ("CSFBC") is a Massachusetts corporation doing business as an investment bank, and was at all relevant times a registered broker-dealer and member of the National Association of Securities Dealers, Inc. ("NASD").[8] CSFBC was a lead underwriter for all of the above-named IPOs (collectively, the "Issuers").[9] CSFBC is a wholly-owned subsidiary of defendant Credit Suisse First Boston (USA), Inc. ("CSFB-USA"), a Delaware corporation, which is in turn a wholly-owned subsidiary of defendant Credit Suisse First Boston, Inc. ("CSFBI"), also a Delaware corporation.[10] CSFBI is jointly owned by defendant Swiss bank Credit Suisse First Boston ("CS") and defendant Swiss holding company Credit Suisse Group ("CSG").[11] CS is wholly owned by CSG.[12] On or about November 3, 2000, CS acquired an underwriter, Donaldson Lufkin & Jenrette, Inc. ("DLJ"), which subsequently became CSFB-USA.[13] "CSFB Defendants" comprises CSFBC, CSFBI, CSFB-USA, CS, and CSG.
Plaintiffs name as defendants five of the fourteen Issuers (the "Issuer Defendants"), to wit: Efficient Networks, eMachines, Lightspan, Tanning, and *572 Tumbleweed. Plaintiffs do not name as Issuer Defendants the other nine Issuers managed by the CSFB Defendants, specifically Airspan, Commerce One, Bsquare, CacheFlow, McData, E.piphany, Handspring, InterNAP, and SupportSoft.[14]
B. The Alleged Scheme
Plaintiffs allege that, while marketing their services to prospective Issuers, the CSFB defendants introduced a scheme called "Pop and Performance," which is referenced by name on at least one marketing slide used by defendants.[15] The "Pop"  a strong rise in share price in the aftermarket immediately following an IPO  occurred because defendants conducted each IPO at a deep discount compared to the actual expected value of the issue.[16] Defendants informed certain potential purchasers of this underpricing, and those individuals immediately bought large quantities of the new issue at deeply discounted prices, causing a large price increase immediately following the offering, which attracted other purchasers to the security.[17] Plaintiffs allege that the "Performance" in defendants' formula refers to a system involving the dissemination of artificially low revenue forecasts with the knowledge that the actual revenue reports would exceed those forecasts, coupled with the dissemination of statements encouraging the public to buy each stock because of its strong revenue growth or potential for upside surprise.[18] Plaintiffs allege that defendants' conduct violated the Securities Exchange Act of 1934 (the "Exchange Act").[19]
C. The Alleged False Statements
Plaintiffs attach to their complaint a thick volume compiling alleged misstatements made by defendants in connection with the revenue forecasts contained in Sales Memos and research reports issued by the CSFB defendants.[20] Plaintiffs parse those misstatements into five categories: (1) "+ESTIMATES" statements, or "Fraudulent Revenue Estimates," which allegedly "omitted to reveal the material fact that the forecasted revenues had been artificially discounted to a substantially lower level than the actual revenues expected by [defendants];" (2) "+SURPRISES" statements, or "Fraudulent Statement[s] of Surprise," which allegedly are misleading because defendants "fully expected actual revenues to exceed the artificially discounted estimates because they had participated in a fraudulent scheme to ensure this occurrence;" (3) "+REVISIONS" statements, or "Fraudulent Revisions of Revenue Forecasts," which allegedly are misleading because defendants "fully expected actual revenues to exceed the artificially discounted estimates;" (4) "+CAUTIONARY" statements, or "Fraudulent Statement[s] About Expected Revenue," "which suggested that the revenue estimates might be under-estimated, or overly conservative, or likely to be beaten, of susceptible to an `upside surprise,' or some other similar statement suggesting that the revenue estimates were too low;" *573 and (5) "+GROWTH" statements, also described as "Fraudulent Statement[s] About Expected Revenue;" which "omitted to reveal the material fact that the forecasted revenues had been artificially discounted."[21] Plaintiffs also include alleged misstatements about IPO discounting and statements supporting defendants' alleged belief that the securities at issue would outperform defendants' estimates, which plaintiffs concede are "not necessarily fraudulent."[22]
Plaintiffs further attach one of two labels to each of their alleged misrepresentations.[23] "+Scienter-Research" notations designate those alleged misstatements made within analysts' reports issued by the CSFB defendants, and "+Scienter-SalesMemo" designates statements made by the CSFB defendants "after numerous meetings with the Issuer company officers."[24] Plaintiffs also list alleged misstatements contained within each Issuer's prospectus.[25]
D. Causation
Plaintiffs allege that "[t]he purposes [sic] and effect of [the alleged] scheme was to create the illusion of ever rising stock prices."[26] Investors allegedly relied on this illusion when buying their shares.[27] Plaintiffs further allege that the market value of the Issuers' securities rose during the Class Period because their companies consistently exceeded revenue forecasts, and the market was conditioned to anticipate such surprises, driving the price of shares ever higher.[28] "CSFBC and the Issuer [defendants], by means of the[ir] misstatements and omissions ... manipulated the revenue forecasts of each Issuer so that the Issuer's actual results would continually exceed the forecasts thereby increasing the `premium' built into the stock price."[29]
Plaintiffs allege that this scheme did not continue indefinitely; the fraud effectively ended when one of three events occurred: (1) the Issuer reported quarterly revenues that failed to exceed projected revenues; (2) the company announced prior to a full quarterly report that its revenues would not meet projected revenues; or (3) analysts revised downward their own published estimates (collectively, "Disclosing Events").[30] The occurrence of one or more Disclosing Events triggered the end of each Subclass Period.[31] Plaintiffs allege that each Issuer's stock price declined substantially after its Disclosing Event.[32]
III. LEGAL STANDARD
A. Standard of Review
Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted only if "`it appears beyond doubt that the plaintiff[s] can *574 prove no set of facts in support of [their] claim[s] which would entitle [them] to relief.'"[33] The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."[34] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiffs' favor.[35] Courts generally do not consider matters outside the pleadings but may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings.[36] However, courts "may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment."[37]
B. Judicial Estoppel
The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken in a prior legal proceeding.[38] It is a "rare remedy" used to avoid inconsistent outcomes and to prevent litigants from abusing the power of the court.[39] To that end, a litigant who asserts judicial estoppel must establish that: "(1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner."[40]
C. Section 10(b) and Rule 10b-5
1. Pleading Standard
To state a prima facie case for securities fraud under section 10 of the Exchange Act[41] and Rule 10b-5 promulgated thereunder, a plaintiff must allege that "`the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff.'"[42] The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b-5 is "`an *575 intent to deceive, manipulate or defraud.'"[43]
Securities fraud actions are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).[44] In addition, a plaintiff who alleges securities fraud under section 10(b) and Rule 10b-5 must also satisfy the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA").[45] To plead a material misrepresentation or omission under the PSLRA "the complaint [must] specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed."[46] "To meet the pleading standard of Rule 9(b), this Court has repeatedly required, among other things, that the pleading `explain why the statements were fraudulent.' "[47]
A plaintiff may also bring a 10b-5 claim alleging "market manipulation"  a term that, in the context of the securities laws, refers "generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."[48] When a plaintiff's 10b-5 claims are based on market manipulation, the specificity requirement is relaxed to compensate for the "inherent difficulty in a plaintiff acquiring specific details on a hidden scheme at the pleading stage."[49] However, "where the complaint alleges market manipulation based upon misrepresentations and omissions, ... the requirement of particularity clearly applies."[50]
2. Bespeaks Caution
Under the "bespeaks caution" doctrine, a misrepresentation or omission contained in a registration statement will be considered immaterial if the registration statement contains cautionary language sufficiently specific to render reliance on the false or omitted statement unreasonable.[51] Generalized disclosures of *576 amorphous risks will not shield defendants from liability; the cautionary language must be "too prominent and specific to be disregarded" and must "warn investors of exactly the risk that plaintiffs claim was not disclosed."[52] Moreover, if a party is aware of a particular problem worthy of disclosure, the party may not rely on general disclaimers to avoid liability.[53] "[T]he inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts."[54]
Cautionary language in securities offerings is just about universal. Thus, the key question a district court must decide when determining whether to grant a motion to dismiss a securities fraud complaint is whether plaintiffs have overcome the existence of such language. Plaintiffs may do this by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss.[55]
3. Transaction Causation and Loss Causation
To maintain a claim for securities fraud, a plaintiff must plead, among other things, both (1) that it relied upon defendant's allegedly fraudulent conduct in purchasing or selling securities, and (ii) that defendant's conduct caused, at least in part, plaintiff's loss.[56] These two elements are known, respectively, as "transaction causation" and "loss causation."
"Transaction causation is generally understood as reliance."[57] Under settled Supreme Court precedent, a rebuttable presumption of transaction causation may be established under the "fraud on the market" theory, even where a plaintiff was unaware of the fraudulent conduct at the time of the purchase or sale.
Succinctly put: "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."[58]
Pleading that defendants perpetrated a fraud on the market, therefore, fulfills a plaintiff's transaction causation pleading requirement. Reliance may also be presumed in cases based on omissions if plaintiffs can show that such omissions were *577 material.[59]
Loss causation, on the other hand, refers to the requirement that a plaintiff demonstrate that the fraudulent scheme caused her loss.[60] In the case of 10b-5 actions for material misstatements or omissions, loss causation generally requires a plaintiff to show that her investments would not have lost value if the facts that defendant misrepresented or omitted had been known.[61]
In the Second Circuit, "in misrepresentation cases, a plaintiff must allege something more than merely artificial inflation [to plead loss causation adequately]."[62] "[T]o establish loss causation, `a plaintiff must allege ... that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'"[63] Plaintiffs may do so by alleging either that "the subject of those false [statements] ... or any corrective disclosure regarding the falsity of those [statements, wa]s the cause of the decline in stock value that plaintiffs claim as their loss" or that defendants "concealed or misstated any risks associated with an investment in" the subject securities.[64]
In market manipulation cases, however, the plaintiff's burden is somewhat different, because of the nature of the artificial inflation caused by manipulative conduct.[65]
[M]arket manipulation is a discrete act that influences stock price. Once the manipulation ceases, however, the information available to the market is the same as before, and the stock price gradually returns to its true value. For example, suppose that a bank manipulates *578 the market for a stock by engaging in `wash sales,' fictitious trading for the purpose of creating a false appearance of activity. By creating an appearance of increased trading volume, wash sales may drive up the price of a security. Once the wash sales cease, ordinary trading resumes. The spectre of wash sales may continue to affect the stock price for some time as investors recall the recent increased activity and observe the higher price; over time, however, the security will fall back to its true investment value.... In market manipulation cases, therefore, it may be permissible to infer that the artificial inflation will inevitably dissipate.[66]
The United States Supreme Court is now considering what pleading standard should be applied to allegations of loss causation.[67] The Court is reviewing a challenge to the Ninth Circuit's relaxed standard of pleading loss causation, which that Circuit has summarized as follows: "loss causation does not require pleading a stock price drop following a corrective disclosure or otherwise. It merely requires pleading that the price at the time of purchase was overstated and sufficient identification of the cause."[68] This uncertainty notwithstanding, it is clear that, under any standard for pleading loss causation, plaintiffs must plead that securities prices were artificially inflated at the time of purchase.
IV. DISCUSSION
A. The Alleged Scheme
The parties devote dozens of pages of briefing to a relatively simple question: exactly what type of fraudulent conduct do plaintiffs allege?[69] Simply put, plaintiffs seek to convince the Court that their case is about "market manipulation" rather than merely misstatements and omissions.[70] Plaintiffs allege that defendants' scheme, characterized by various misstatements and omissions,[71] somehow "artificial[ ly] *579 condition[ed] the public marketplace to expect ... `upside surprises.'"[72] Plaintiffs contend that this "artificial conditioning" caused artificial inflation in the Issuers' stock prices, presumably in a manner similar to the false appearance of demand generated by more traditional manipulative practices, such as wash sales. Defendants vigorously dispute this proposition, observing that "[t]he only acts alleged to have `manipulated' the Issuers' stock prices are alleged misstatements and omissions, notwithstanding Plaintiffs' self-serving attempt to characterize the misstatements and omissions as merely `ancillary' to their case."[73]
The stakes in this semantic dispute are high. If plaintiffs' alleged losses were caused by market manipulation, rather than by misstatements and omissions, then plaintiffs face a lighter burden in pleading their claims.[74] However, plaintiffs' strenuous efforts to portray their claims as market manipulation claims are to no avail. The TAC clearly alleges numerous misstatements and omissions, but nowhere refers to the sort of conduct that rises to the standard of "market manipulation" under the securities laws.[75] The "artificially conditioned" demand alleged by plaintiffs is functionally identical to the artificial demand created in a misstatement case where a defendant falsely announces positive financial results. In both types of cases, plaintiffs allege that the investing public is misled by the available information, believes that the stock is underpriced, and purchases the stock in anticipation of gains when the stock price rises.
Market manipulation cases are treated differently in large part because the method of generating demand in the marketplace is secretive and difficult for an investor to detect.[76] When wash sales are used to increase trading volume and simulate greater demand for a security, investors may be misled into believing that the rest of the market has discovered some positive information, and is purchasing shares to take advantage of that implicit "good news." The efficient market hypothesis holds that public information about a security is immediately incorporated into share prices.[77] A necessary corollary of the efficient market hypothesis is that when an investor observes heightened market activity and a rise in share prices, that investor relies on market efficiency to support the assumption that new information has entered the market.[78] Thus, while *580 misrepresentations affect investor beliefs firsthand  by directly injecting false information into the marketplace  market manipulation affects beliefs indirectly by creating circumstantial evidence that positive information has entered the market. When secret manipulation affects beliefs indirectly, courts understand that it may be more difficult for plaintiffs to outline the scheme with great particularity; thus, market manipulation plaintiffs are given more leeway in alleging manipulative conduct.[79]
Similarly, when market manipulation is the cause of artificial inflation, pinpointing a "disclosing event" at which point all the artificial inflation leaves the market price of a security is difficult. Because the initial manipulation occurred in secret, artificial inflation can be presumed to dissipate gradually as investors analyze all available information, including the return to normal levels of market activity, and come to realize that the stock is overvalued.[80] This stands in sharp contrast to the method by which loss causation is shown in a misrepresentations case. In such a case, artificial inflation is presumed to dissipate when the false information is publicly corrected.[81] Thus, plaintiffs must identify particular "disclosing events" that corrected the false information, and tie dissipation of artificial price inflation to those events.[82]
Plaintiffs' allegations do not present the pleading difficulties present in true market manipulation cases. All of the actions that plaintiffs claim affected market beliefs took the form of publicly available statements about the Issuers' prospects and revenues. Similarly, plaintiffs allege that the materially misleading information was corrected by "Disclosing Events," at which point "[e]ach Issuer's stock price suffered substantially" and "the fraudulently induced expectation of continuing upside surprises ended."[83] Thus, because plaintiffs' allegations of fraudulent conduct and loss causation objectively rely on public statements and events, and do not rest on secret price manipulation, plaintiffs may not avail themselves of the relaxed pleading standards applied to market manipulation claims.[84]
*581 B. The Prospectuses
While plaintiffs bring no claims pursuant to the Securities Act of 1933 (the "Securities Act")[85] for the issuance of defective registration statements, they do allege that defendants'"Pop and Performance" scheme included the underpricing of the IPOs themselves as well as the issuance of artificially depressed earnings estimates.[86] Moreover, plaintiffs allege that some of the statements in the prospectuses were materially misleading because they omitted the material fact that Defendants had purposely discounted the IPO price and made limited disclosures of that fact to select IPO investors.[87]
1. Judicial Estoppel
Defendants argue that because of certain representations made in plaintiffs' submissions in connection with their motion for leave to amend, plaintiffs are judicially estopped from now relying on IPO underpricing as the basis for their claimed damages. Defendants rest their argument on the following passage from plaintiffs' moving papers:
While it is true that Plaintiffs do provide in their Amendment references to certain background facts or adjunct activities that may be fraudulent  in particular, the deliberate under pricing of Issuer Defendants' IPOs  those references are neither the basis for Plaintiffs' claims of alleged fraud, nor the basis for the damages that Plaintiffs seek to recover.[88]
Defendants are correct. Plaintiffs may not assert any claims arising solely from the alleged underpricing of the Issuers' IPOs.[89] Indeed, plaintiffs disclaim any intent to do so.[90] Plaintiffs are bound by their previous assertion that they do not seek damages arising from the alleged deliberate underpricing of the Issuers' IPOs. Accordingly, plaintiffs may not assert claims based on the dissipation of any artificial inflation that resulted from the alleged IPO underpricing.
*582 2. The Alleged Misrepresentations
The Issuers' prospectuses each assert that the offering prices were determined after negotiations between the Issuer and the CSFB defendants, and list factors that were taken into consideration in setting the offering price.[91] Plaintiffs assert that the prospectuses are materially misleading because they omit that one factor taken into account when setting the price was defendants' scheme to artificially inflate the market through habitually discounting offering prices and earnings estimates.[92] Defendants argue that such statements cannot be actionable because the prospectuses were not held out as market valuations, that IPO prices are too speculative to serve as market valuations as a matter of law and that, in any case, the prospectuses so clearly counsel against relying on their price predictions that plaintiffs are barred from relying on them under the "bespeaks caution" doctrine.[93]
Defendants are correct. Every one of the prospectuses contains pages of warnings counseling investors not to rely on the offering documents as any indication of the ultimate market value of the securities.[94] No reasonable investor interprets an offering price, standing alone, as a guarantee of any particular post-offering market value.[95] Moreover, plaintiffs do not allege that any of the prospectuses explicitly stated that it could be construed as predicting a future market value.[96] Quite the contrary. The eMachines prospectus, for example, contains the following cautionary language:
Our quarterly operating results are subject to fluctuations and seasonality that make it difficult to predict our future performance.

. . . . .
Prior to this offering, there has not been a public market for our common stock. We cannot predict the extent to which investor interest in eMachines will lead to the development of a trading market or how liquid that market might become. The initial public offering price for our shares has been determined by negotiations between us and the representatives of the underwriters and may not be indicative of prices that will prevail in the trading market.

. . . . .
*583 We have a limited operating history upon which you can base an evaluation of our business and prospects. Our prospects must be considered in light of the risks, expenses, and difficulties encountered by companies in their early stage of development. It is likely that in some future quarter our operating results may fall below the expectations of securities analysts and investors. In this event, the trading price of our common stock may fall significantly.[97]
Each of the prospectuses contains similar cautionary language.[98] Because, in light of these ample warnings, no reasonable investor could have interpreted the IPO offering prices to be valuations of the market value of the securities, the prospectuses' alleged omissions of defendants' true beliefs about market valuation are immaterial as a matter of law.[99]
C. Transaction Causation and Loss Causation
Every one of plaintiffs' six claims for relief is based on plaintiffs' allegation that "[t]he purposes and effect of [the alleged] scheme was to create the illusion of ever rising stock prices...."[100] Defendants argue, though, that "[t]he market [] did not react as Plaintiffs have theorized, and where, as here, the objective facts disprove the allegations, Plaintiffs are not entitled to an inference  in disregard of the objective facts  that the understatements of future earnings estimates nevertheless moved the market as alleged and inflated the share prices."[101]
"Though all reasonable inferences are drawn in the plaintiff's favor on a motion to dismiss on the pleadings, `conclusions of law or unwarranted deductions of fact are not admitted.' "[102] A district court may take judicial notice of well-publicized stock prices when considering a motion to dismiss.[103] Such judicial notice is particularly appropriate where "the movement of [the] stock price is integral to the plaintiffs' fraud-on-the-market theory."[104]
Defendants have submitted a number of charts summarizing pertinent trading data *584 for the five Issuer defendants.[105] None of those charts supports plaintiffs' theories that "[d]uring the class period, stock prices of technology IPO Stocks rose because their actual results exceeded or beat revenue forecasts,"[106] or that "stock prices of technology IPO Stocks rose in anticipation of forecasts being exceeded by actual results."[107] Efficient Networks stock, for example, declined after each of the five upside surprises alleged by plaintiffs.[108] The securities of the other four Issuer defendants show no consistent pattern of price increases after an upside surprise; rather, the price of those securities fell more often than it rose after the occurrence of each upside surprise.[109]
If plaintiffs had alleged that defendants had misrepresented material facts about the Issuers' prospects and that such misrepresentations had "buoyed a price that otherwise would have sunk much faster,"[110] then such observable declines would not scuttle plaintiffs' claims. But plaintiffs' case does not depend on the simple inflation of stock prices; rather, plaintiffs allege that stock prices rose because defendants' conduct created "the illusion of ever rising stock prices."[111] If any investor had such an impression of the securities at issue, it must truly have been illusory, because widely disseminated trading data shows that the prices of the subject securities were anything but "ever rising."[112]
As defendants note, plaintiffs' alleged "scheme is largely (if not entirely) counterintuitive."[113] Unlike most misrepresentation cases, which allege that a defendant hyped its securities or omitted to disclose potentially damaging information, plaintiffs' case rests on the premise that defendants manipulated stock prices by artificially denigrating the prospects of the Issuers. Under plaintiffs' theory, this understatement combined with repeated upside surprises to instill a false expectation that the securities were undervalued and would continue to produce upside surprises and price inflation. Of course, not all securities fraud cases involve hyping securities to increase market prices. Short sellers, for instance, may benefit from issuing untrue damaging information to allow them to cover their sales at a lower price, and purchasers may try to depress a price artificially so they can buy low and benefit from any price rebound. But most misrepresentation cases do at least allege that defendants misrepresented the facts in a manner that is directly related to the desired price effect  that is, if a defendant wants a stock to appreciate in value, she overstates its worth, and vice versa.
By contrast, the kind of "reverse psychology" manipulation alleged by plaintiffs here requires more than bare allegations of falsity and materiality. Plaintiffs' allegations, which rely on the idea that repeated *585 upside surprises  and investors' anticipation of such surprises  artificially inflated stocks by creating upward price momentum, cannot be adequate if judicially noticed facts contradict the very basis for plaintiffs' claims. Plaintiffs have made it abundantly clear that the Third Amended Complaint rests on the central allegation that defendants' understated revenue predictions, when repeatedly disproved, created investor excitement and upward price momentum.[114] Plaintiffs do not dispute the trading data submitted by defendants, but merely assert that their allegations of market inflation (which include no specific discussion of the effects of each upside surprise or conditioning statement, but merely compare the high prices of each issue during the class period to the IPO prices)[115] are sufficient.[116]
However, plaintiffs cannot simply allege that stock prices rose at some point during the class period and infer from that activity that the alleged fraudulent activity actually caused prices to rise or caused investors to buy more shares. Where plaintiffs' theory of causation depends not just on the content of individual misstatements creating misleading information about market value, but rather on investor beliefs caused by the confluence of depressed projections, conditioning statements, upside surprises and observed increases in stock prices, publicly available trading data directly contradicting plaintiffs' allegations of price increases can be fatal to plaintiffs' case. By contrast, plaintiffs' background allegations that defendants sought to generate quick initial price increases by underpricing IPOs and selectively informing investors of the underpricing are supported by actual immediate growth in each of the Issuers' market values immediately following their IPOs.[117] However, plaintiffs cannot base their *586 claims on background allegations of IPO underpricing; rather, plaintiffs must allege transaction causation in connection with their actual claims  which explicitly allege that "[t]he purposes [sic] and effect of [the alleged] scheme was to create the illusion of ever rising stock prices."[118] Because that illusion was not achieved  as can be determined by a cursory glance at the price of the Issuers' securities during the class period  plaintiffs cannot claim that investors chose to buy shares based on their observations of price movement that never materialized.
Plaintiffs make much of their argument that they allege a "market manipulation" case, as opposed to one based on misrepresentations. The difference between the type of causation alleged by plaintiffs here and the type that might be alleged by plaintiffs in a hypothetical market manipulation case is illustrative. In a case alleging that trading volume was artificially enhanced by wash sales or escalating purchase agreements, transaction causation springs from the trust investors have in market efficiency  i.e., the market relies on the price and activity level of the market itself to reflect the real worth of the security. Plaintiffs, though, allege that the market relied on explicit information about the value of the security  not on the objective features of the market  to determine the market price of the Issuers' securities. Plaintiffs thus may not rely on bare allegations that the market price was manipulated to establish transaction causation; rather, they must allege that the beliefs fostered by defendants' alleged misstatements and omissions induced reasonable investors to purchase the Issuers' securities. Under the peculiar allegations of this case, plaintiffs' burden is even greater, because plaintiffs do not simply allege that the misrepresentations themselves inflated prices, but rather that a complex pattern of necessary steps  depressed projections, conditioning statements, building anticipation, publicity regarding upside surprises, and price increases before and after such surprises  combined to instill a misleading belief in investors. But plaintiffs do not allege facts supporting an inference that such price inflation ever actually happened.
Although the Supreme Court has not yet ruled on exactly what loss causation standard should be applied in the context of a motion to dismiss, no loss causation standard can be satisfied without a basic allegation that defendants' conduct actually caused some price changes in the stock.[119] Plaintiffs' allegations, which depend on the illusion that stock prices themselves rose throughout the class periods, allege a pattern of price momentum that is flatly contradicted by actual trading data. Because plaintiffs do not allege a mechanism of artificial price inflation that survives exposure to actual trading data, they fail to allege loss causation under any standard.[120]
Unlike scienter, which may be pled adequately as to some defendants and inadequately as to others,[121] loss causation is a global pleading requirement. Because plaintiffs do not sufficiently allege that defendants' *587 scheme inflated prices or caused compensable losses, the complaint must be dismissed in its entirety.[122] Accordingly, I need not address defendants' other arguments.
V. CONCLUSION
For the foregoing reasons, plaintiffs' Third Amended Complaint is dismissed with prejudice. A conference to discuss pending motions for sanctions is scheduled for 4:30 P.M. on April 12, 2005, in Courtroom 15C. The Clerk is directed to close these motions (Nos. 15, 19, 22, 24, 26 and 31 on the docket sheet).
SO ORDERED.
NOTES
[1] See In re Initial Public Offering ("In re IPO") Sec. Litig., 341 F.Supp.2d 328, 329-43 (S.D.N.Y.2004).
[2] See Plaintiffs' Third Amended Complaint ("TAC") ¶ 2 ("Defendants made statements within [] research reports designed to condition the public market to expect `upside surprises.'").
[3] See Memorandum of Law in Support of the Motion to Dismiss the Third Amended Complaint of Credit Suisse First Boston Corp., Credit Suisse First Boston (USA), Inc., and Credit Suisse First Boston, Inc. ("CSFB Mem."); Motion to Dismiss and Incorporated Memorandum of Law of eMachines, Inc. (the "eMachines Mem."); Tumbleweed Communication Corp.'s Memorandum of Law in Support of Its Motion to Dismiss the Third Amended Complaint ("Tumbleweed Mem."); Motion to Dismiss and Incorporated Memorandum of Law of Tanning Technology Corp. (the "Tanning Mem."); Issuer Defendants' Memorandum of Law in Support of their Motion to Dismiss the Third Amended Complaint ("Issuer Mem."); Memorandum of Law in Support of the Motion to Dismiss the Third Amended Complaint of Credit Suisse First Boston and Credit Suisse Group (the "CS Mem."); Supplemental Motion to Dismiss and Incorporated Memorandum of Law of Tanning ("Tanning Supp. Mem.").
[4] In addition to their transaction and loss causation arguments, defendants argue: that the TAC fails to identify any misstatements made by certain defendants, see Issuer Mem. at 5-9, CS Mem. at 4, or plead that any misstatements made by others should be attributed to those defendants, see Issuer Mem. at 10-14; CS Mem. at 4-6; that the TAC inadequately pleads control person liability, see CS Mem. at 6-8; that the TAC inadequately pleads that defendants' statements were false, see CSFB Mem. at 13-16; that the TAC inadequately pleads scienter as to one or more defendants, see CSFB Mem. at 16-24; Issuer Mem. at 15-20; eMachines Mem at 3-4; that plaintiffs have not properly served CSG, see CS Mem. at 1-4; that the named plaintiffs lack standing with respect to Tanning or Tumbleweed, see Tanning Mem. at 1-2; Tumbleweed Mem. at 1-2; and that plaintiffs fail to allege any non-IPO manipulation of the eMachines market, see eMachines Mem. at 2-3.
[5] As I have noted, plaintiffs' allegations are set forth at length in my June 8, 2004 Opinion. This section sets forth only those facts that are pertinent to the instant motion.
[6] See TAC ¶ 53.
[7] See id. ¶¶ 8-23.
[8] See id. ¶ 24.
[9] See id.; Ex. A to TAC.
[10] See id. ¶¶ 25-26.
[11] See id. ¶ 27.
[12] See id.
[13] See id. ¶ 28.
[14] Id.
[15] See id. ¶ 73.
[16] See id.
[17] See id.
[18] See id. ¶ 62.
[19] 15 U.S.C. § 78 et seq.
[20] See Plaintiffs' Attached Exhibits to [Third] Amended Complaint ("TAC Exhibits"). The TAC Exhibits comprise five exhibits and four pages of introductory text, entitled "Index Key." Citations are to the Index Key unless otherwise noted.
[21] Id. at 1-3.
[22] Id. at 3.
[23] See id. at 4.
[24] Id.
[25] See Ex. C to TAC Exhibits.
[26] TAC ¶¶ 256, 267. Plaintiffs' remaining four claims for relief all arise under section 20(a) of the Exchange Act and depend upon plaintiffs' 10b-5 claims, both of which explicitly allege that the scheme produced "the illusion of ever-rising stock prices." See id. ¶¶ 276-294.
[27] See id. ¶ 218.
[28] See id. ¶¶ 220-222.
[29] Id. ¶ 223.
[30] See id. ¶¶ 224-225.
[31] See id. ¶¶ 53, 225.
[32] See id. ¶¶ 226-227.
[33] Weixel v. Board of Educ. of New York, 287 F.3d 138, 145 (2d Cir.2002) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).
[34] Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 101 (2d Cir.2003) (quotation marks and citations omitted).
[35] See Chambers v. Time Warner Inc., 282 F.3d 147, 152 (2d Cir.2002).
[36] See id. at 152-53; In re IPO, 241 F.Supp.2d 281, 331 (S.D.N.Y.2003).
[37] Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 n. 8 (2d Cir.2000) (citing cases). Accord In re AOL Time Warner, Inc. Sec. and ERISA Litig., 381 F.Supp.2d 192, 2004 WL 992991, at *38 n. 61 (S.D.N.Y. May 5, 2004).
[38] See New Hampshire v. Maine, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001); In re Bradlees Stores, Inc., No. 01 Civ. 3934, 2001 WL 1112308, at *10 (S.D.N.Y. Sept. 20, 2001).
[39] See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Republic of Romania, 123 F.Supp.2d 174, 189 (S.D.N.Y.2000) (citing United States v. Hussein, 178 F.3d 125, 130 (2d Cir.1999); Simon v. Safelite Glass Corp., 128 F.3d 68, 71 (2d Cir.1997); Maharaj v. Bankamerica Corp., 128 F.3d 94, 98 (2d Cir.1997)).
[40] AXA Marine and Aviation Ins. (U.K.) Ltd. v. Seajet Indus. Inc., 84 F.3d 622, 628 (2d Cir.1996).
[41] 15 U.S.C. § 78j.
[42] Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir.2003) (quoting Ganino, 228 F.3d at 161 (citing cases)).
[43] Ganino, 228 F.3d at 168 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).
[44] Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances concerning fraud and mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind may be averred generally." See also In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir.2001) (applying Rule 9(b) standard to securities fraud claims).
[45] Pub.L. No. 104-67, 109 Stat. 737 (1995). See Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir.2000).
[46] 15 U.S.C. § 78u-4(b)(1).
[47] Rombach v. Chang, 355 F.3d 164, 172 (2d Cir.2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993)). See also id. ("The PSLRA imposes similar requirements to claims brought under the Exchange Act: `the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'") (citing 15 U.S.C. § 78u-4(b)(1)).
[48] Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476-77, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).
[49] THC Inc. v. Fortune Petroleum Corp., No. 96 Civ. 2690, 1999 WL 182593, at *3 (S.D.N.Y. Mar. 31, 1999).
[50] Sabratex Corp. v. Keyser, No. 99 Civ. 8589, 2000 WL 423529, at *4 (S.D.N.Y. Apr.19, 2000) (emphasis added).
[51] See P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 96 (2d Cir.2004); see also Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir.2002) ("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."); Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir.1996) (finding no liability where prospectus gave "prominent and specific" warnings of "exactly the risk the plaintiffs claim was not disclosed" so as to "bespeak caution").
[52] Olkey, 98 F.3d at 5.
[53] See In re IPO, 358 F.Supp.2d 189, 211-12 (S.D.N.Y.2004).
[54] Rubinstein v. Collins, 20 F.3d 160, 171 (5th Cir.1994).
[55] Halperin, 295 F.3d at 359.
[56] See Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 179 (2d Cir.2001).
[57] Id. at 186.
[58] Basic, Inc. v. Levinson, 485 U.S. 224, 241-42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (alterations in original) (quoting Peil v. Speiser, 806 F.2d 1154, 1160-61 (3d Cir.1986)).
[59] See Castellano, 257 F.3d at 186; Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 539 (2d Cir.1999). See also In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 291 (S.D.N.Y.2003) (citing Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)).
[60] See Marbury Mgmt., Inc. v. Kohn, 629 F.2d 705, 716-17 (2d Cir.1980) (Meskill, J., dissenting) (noting that "a fundamental principle of causation which has long prevailed under the common law of fraud and which has been applied to comparable claims brought under the federal securities acts ... is, quite simply, that the injury averred must proceed directly from the wrong alleged and must not be attributable to some supervening cause."). In 1995, Congress codified the loss causation requirement in the PSLRA:

In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.
15 U.S.C. § 78u-4(b)(4).
[61] See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 96 (2d Cir.2001).
[62] Fogarazzo, 341 F.Supp.2d at 287 (footnote omitted). But see Broudo v. Dura Pharms., Inc., 339 F.3d 933, 938 (9th Cir.2003) (holding that plaintiffs need only allege that they bought securities at artificially inflated prices to allege loss causation), cert. granted by Dura Pharms., Inc. v. Broudo, 542 U.S. 936, 124 S.Ct. 2904, 159 L.Ed.2d 811 (2004).
[63] Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir.2005) (emphasis in original) (quoting Suez Equity, 250 F.3d at 95). See also Fogarazzo, 341 F.Supp.2d at 289 (noting that courts have found plaintiffs sufficiently pleaded loss causation where "defendants ['] misrepresentations [] went to the value of the security" and that "the ultimate decline in the companies' stock price was attributable to the very thing that the defendants allegedly lied about"). But see Broudo, 339 F.3d at 938.
[64] Lentell, 396 F.3d at 175.
[65] The word "manipulative" is "virtually a term of art when used in connection with securities markets. It connotes intentional or wilful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Hochfelder, 425 U.S. at 199, 96 S.Ct. 1375.
[66] In re IPO, 297 F.Supp.2d 668, 674 (S.D.N.Y.2003) (footnotes omitted).
[67] See Dura Pharms., Inc. v. Broudo, No. 03-932, cert. granted by Dura Pharms., 124 S.Ct. 2904 (2004), argued Jan. 12, 2005.
[68] Broudo, 339 F.3d at 938. Broudo is a misrepresentation case. Id. at 935-36. However, the Ninth Circuit has applied a similar standard to cases alleging market manipulation. See, e.g., Polinsky v. MCA, Inc., 680 F.2d 1286, 1290 (9th Cir.1982) (holding that plaintiffs' market manipulation claims failed to satisfy loss causation requirement because even if the allegedly fraudulent "tender offer had been successful... then Appellees' position would not have changed and they would not have made the additional profits they seek"). In any case, any ruling by the Supreme Court in Dura Pharms. will certainly affect the pleading standard for misrepresentation cases like this one.
[69] See, e.g., Issuer Mem. at 3-5, 32; Plaintiffs' Response in Opposition to Defendants' Motions to Dismiss ("Pl.Opp.") at 2-16, 20-30, 34, 39-45, 57, 61-64, 74-75; Reply Memorandum of Law in Support of the Motion to Dismiss the Third Amended Complaint of CSFBC, CSFB-USA and CSFBI ("CSFB Reply") at 2-8; Issuer Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss the Third Amended Complaint ("Issuer Reply") at 2-5.
[70] See, e.g., Pl. Opp. at 2-16, 20-30.
[71] The acts plaintiffs allege constituted defendants' fraudulent scheme include: issuing prospectuses that omitted "the material fact that Defendants had purposely discounted the IPO price and made limited disclosures of that fact to select IPO investors," issuing purposefully discounted earnings predictions for the Issuers, and issuing analysts' reports that deemed the securities subject to "upside surprise"  that is, that the securities would likely exceed defendants' predictions. Id. at 12-13. While plaintiffs have disclaimed any reliance on IPO underpricing in proving their damages, alleged misstatements contained in the Issuers' prospectuses remain relevant to the extent that they fraudulently understated expected earnings and were intended to promote "upside surprises." See infra Part IV.B.1.
[72] TAC ¶¶ 1-2.
[73] Issuer Reply at 3 (quoting Pl. Opp. at 10).
[74] See supra Parts III.C.1 (discussing relaxed requirement to plead manipulative acts with particularity), III.C.1.b (discussing relaxed requirement to plead loss causation in market manipulation cases).
[75] See Santa Fe, 430 U.S. at 476-77, 97 S.Ct. 1292.
[76] See THC, 1999 WL 182593, at *3.
[77] See, e.g., In re Executive Telecard, Ltd. Sec. Litig., 979 F.Supp. 1021, 1028 (S.D.N.Y.1997) ("Under the efficient market hypothesis endorsed by the plurality in Basic v. Levinson, the price of a security reflects all publicly available information.").
[78] See, e.g., Greenberg v. Crossroads Systems, Inc., 364 F.3d 657, 662 n. 6 (5th Cir.2004) ("Therefore, when someone purchases a company's stock in an efficient market, we can presume that he relied `on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price.'") (alteration omitted) (quoting Blackie v. Barrack, 524 F.2d 891, 907 (9th Cir.1975)).
[79] See THC, 1999 WL 182593, at *3.
[80] See In re IPO, 297 F.Supp.2d at 674.
[81] See id. at 671 ("[C]ourts have held that a disclosure correcting an earlier misstatement or omission can, coupled with allegations of artificial inflation, suffice to plead loss causation.").
[82] See Lentell, 396 F.3d at 173 (plaintiffs must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security").
[83] See TAC ¶¶ 225-227.
[84] Plaintiffs argue that this is a market manipulation case, based on the allegations that defendants conditioned the market to expect upside surprises, and therefore created some inflation independent of that caused by any false statements. Plaintiffs contend that this inflation gradually dissipated from the securities, rather than disappearing suddenly after a disclosing event, because no statements "ever disclosed what was truly going on and the gross extent to which the system had been rigged." Pl. Opp. at 62. Essentially, plaintiffs argue that the alleged Disclosing Events did not result in complete market corrections because they did not disclose that defendants' alleged misstatements were part of a scheme to defraud investors. But a disclosing event need not disclose every bit of a fraudulent scheme, including the fact of the scheme itself, to remove price inflation from the market. Otherwise, no scheme could be fully "disclosed" until the matter is litigated, and every plaintiff class could avail itself of the relaxed "gradual dissipation" loss causation pleading requirement associated with market manipulation claims. The issue is moot, though, because plaintiffs explicitly allege that "the fraudulently induced expectation of continuing upside surprises ended" whenever a Disclosing Event occurred. TAC ¶ 225.
[85] 15 U.S.C. § 77 et seq.
[86] Plaintiffs allege that the CSFB defendants and the Issuer defendants participated in the creation and dissemination of the Issuers' prospectuses. See TAC ¶¶ 192-193. Plaintiffs also allege generally that the Swiss defendants "aided and abetted CSFBC's fraud," but do not allege any specific involvement by the Swiss defendants in drafting the Issuers' prospectuses. Id. at 65 (section heading). See also id. ¶¶ 228-240 (describing the Swiss defendants' involvement; alleging, inter alia, that some of the CSFB defendants "could not have carried out or continued their fraudulent scheme without CS and CSG's explicit involvement.").
[87] See TAC ¶ 190.
[88] 11/25/03 Plaintiffs' Response in Opposition to Defendants' Motions Opposing Plaintiffs' Motion for Leave to Amend the Complaint at 3-4.
[89] This Court has already relied on plaintiffs' representations. In considering plaintiffs' motion for leave to amend their complaint, I held that "[p]laintiffs' allegations regarding analysts' conflicts of interest and misrepresentations made during the IPO process are properly regarded as factual allegations establishing necessary background for the Plaintiffs' claims for relief," but their allegations of IPO underpricing cannot be the sole basis for their claims. In re IPO, 341 F.Supp.2d at 348.
[90] See Pl. Opp. at 34-36 (asserting that "[i]t is background and it is a piece of the overall scheme ... only to the extent that the selective telling of some members of the buying public is included and the creation of the demand was designed to create a `pop' in the stock price in the aftermarket").
[91] See id. at 11 (noting that such factors included "the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies") (quoting Ex. C to TAC Exhibits). The CacheFlow prospectus did not list any factors, but merely noted that the price was "based on several factors." Id.
[92] See id. at 11-12.
[93] See Issuer Mem. at 6-8.
[94] See 9/30/04 Exhibit Book and Declaration of Robert W. Trenchard in Support of the Motion to Dismiss the Third Amended Complaint of CSFBC, CSFB-USA and CSFBI ("CSFB Exhibit Book").
[95] See Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 366 (2d Cir.1973) (cert. denied by Securities and Exchange Commission v. Bangor Punta Corporation, 414 U.S. 924, 94 S.Ct. 234, 38 L.Ed.2d 158 (1973)) (holding that a release setting a price as a fair value for newly issued securities does not constitute a guarantee of market value absent explicit language to that effect, noting that "[a] reasonably knowledgeable investor is aware that the `value' of a security can refer either to the market or sales price of the security or to its worth as measured by the assets and earnings of the issuing company. The absence of the term `market value' in the release, as well as the fact that the valuation was to be `in the judgment of the First Boston Corporation', would suggest to a prudent investor that `value' here was to be based on an appraisal of assets and earnings.").
[96] See id.
[97] See eMachines Prospectus Excerpts, Ex. 1 to Issuer Mem., at 6, 21, 34.
[98] See CSFB Exhibit Book.
[99] See, e.g., Rombach, 355 F.3d at 173 ("Under the bespeaks caution doctrine, alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.") (quotations marks, citation and alteration omitted). To hold otherwise would create an unacceptable burden on underwriters and issuers negotiating offering prices. As I have noted, "[f]or at least five decades, studies have shown that IPOs generally trade on the open market at a price significantly higher than the offering price." In re IPO, 241 F.Supp.2d at 300. If plaintiffs' argument were adopted by the courts, then no amount of cautionary language would suffice to protect issuers and underwriters from liability whenever the market price of a security deviates substantially from the offering price. Not only would such a rule vastly increase the exposure of those who underwrite IPOs, it would effectively destroy the competitive process by which issuers search for underwriters, because no underwriter could offer to conduct an IPO at any price other than the predicted market value of the securities.
[100] TAC ¶¶ 256, 267. Plaintiffs' remaining four claims for relief all arise under section 20(a) of the Exchange Act and depend upon plaintiffs' 10b-5 claims, both of which explicitly allege that the scheme produced "the illusion of ever-rising stock prices." See id. ¶¶ 276-294.
[101] Issuer Mem. at 28.
[102] Lentell, 396 F.3d at 174-75 (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir.1994)).
[103] Ganino, 228 F.3d at 167 n. 8.
[104] Id.
[105] See Ex. B to Issuer Mem.
[106] TAC ¶ 221.
[107] Id. ¶ 222.
[108] See Issuer Mem. at 28.
[109] See Ex. B to Issuer Mem.
[110] DeMarco v. Robertson Stephens, Inc., 318 F.Supp.2d 110, 124 (S.D.N.Y.2004) (explaining that price declines may not be inconsistent with theory that alleged misrepresentations artificially inflated stock prices, because plaintiffs could still recover if the artificially inflated price merely sunk less than the price otherwise would have sunk).
[111] TAC ¶ ¶ 256, 267
[112] See Ex. B to Issuer Mem; see also CSFB Exhibit Book (showing that market prices for the non-defendant Issuers fluctuated throughout the class period).
[113] Issuer Mem. at 28 n. 22.
[114] See, e.g., Pl. Opp. at 8 ("the effect was to trick the public by way of the illusion of artificially created demand") (emphasis in original); id. ("Defendants wanted the stock price to keep going up"); id. ("What was the investing public to do but to wonder how long the winning streak from one company to the next would continue"); id. at 27 ("a litany of `conditioning statements'... were intended to evoke excessive buying-demand"); id. at 36 ("Plaintiffs make [allegations regarding prospectus misstatements] to provide support for their claims that Defendants engaged in an ongoing, consistent scheme of depressing revenue projections to achieve quick and sustained growth in share prices.") (quoting In re IPO, 341 F.Supp.2d at 348 n. 185); id. at 37 ("scheme is based upon the conditioning of the market"); id. at 57 (noting that plaintiffs' omissions claims are "ancillary because they are entirely dependent upon" plaintiffs' claim that the market was conditioned to expect upside surprises) (emphasis in original); id. at 59 ("Plaintiffs' complaint alleges that Defendants' manipulative scheme was successful in its intent to get each of the Issuer Defendant[s'] stock to `Perform' to some degree above the IPO price ... [and] alleges that Defendants' manipulative scheme was successful in its intent to condition stock prices to rise in anticipation of forecasts being exceeded."); id. at 62 ("The intent was to prime the market to expect (anticipate) that the surprise would occur (and keep occurring indefinitely). As the TAC states: `During the class period, stock prices of technology IPO Stocks rose in anticipation of forecasts being exceeded by actual results.'") (emphasis in Pl. Opp.).
[115] See TAC ¶ 62.
[116] See PI. Opp. at 62-63 (noting that "Plaintiffs' Exhibits attached to their Complaint list exhaustively each such identifiable occurrence of these `conditioning statements,' ... [but that] Plaintiffs do not include in their Complaint any data about what did or did not happen to the stock prices on the days when the false `surprises' were announced.").
[117] Defendants assert that even this was not the case with respect to the eMachines IPO, which saw only very modest gains in the first trading day and actually closed that day below the IPO price. See eMachines Mem. at 1-2.
[118] TAC ¶¶ 256, 267.
[119] See, e.g., Lentell, 396 F.3d at 173; Broudo, 339 F.3d at 938.
[120] Defendants have raised numerous other loss causation arguments. However, because plaintiffs' TAC does not meet even the most lenient current standard for loss causation, there is no need to discuss defendants' other arguments, which are based on Second Circuit law that could be modified by the Supreme Court.
[121] See, e.g., In re IPO, 241 F.Supp.2d at 359-72 (dismissing some claims for which scienter had been inadequately pled and allowing others to proceed).
[122] As a result, plaintiffs' motion for leave to amend their complaint and substitute lead plaintiffs in the Tumbleweed matter is denied as moot. See 2/26/05 Letter from John G. Watts, counsel for plaintiffs, to the Court.